# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

LARISSA SCHUSTER,

      Petitioner,

    v.

JANEL ESPINOZA,

      Respondent.

Case No. 1:12-cv-01482-AWI-SAB-HC

FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS

(ECF No. 4)

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On December 12, 2007, Petitioner was convicted after a jury trial in the Fresno County Superior Court of first-degree murder.[1] The jury also found true the special allegation that the offense was carried out for financial gain. (17 CT[2] 5046). Petitioner was sentenced to life in prison without the possibility of parole. (LD[3] 1). On February 28, 2011, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Schuster, No. F055692, 2011

---

[1] Venue for Petitioner's trial was changed to Los Angeles County. People v. Schuster, No. F055692, 2011 WL 680211, at *1 n.2 (Cal. Ct. App. Feb. 28, 2011).
[2] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on December 21, 2018. (ECF No. 131). CT page numbers refer to the page numbers stamped at the top right corner.
[3] "LD" refers to the documents lodged by Respondent on December 21, 2018. (ECF No. 131).

WL 680211 (Cal. Ct. App. Feb. 28, 2011). The California Supreme Court denied Petitioner's petition for review on June 8, 2011. (LDs 3, 4).

On September 7, 2012, Petitioner commenced the instant proceeding by filing a petition for writ of habeas corpus. (ECF No. 1). On December 14, 2012, Respondent filed a motion to dismiss the petition as untimely. (ECF No. 15). On March 28, 2016, the Court granted the motion to dismiss and dismissed the petition as untimely. (ECF No. 59). The Ninth Circuit reversed the judgment and remanded the case for further proceedings. (ECF No. 67).

In the petition, Petitioner raises the following claims for relief: (1) <u>Miranda</u> violation; (2) instructional errors; (3) ineffective assistance of counsel; (4) erroneous discharge of juror; and (5) cumulative error. (ECF No. 4). Respondent filed an answer, and Petitioner filed a traverse. (ECF Nos. 130, 136).

## II.

## STATEMENT OF FACTS[4]

***PROSECUTION EVIDENCE***

As of early 2002, Schuster resided in Clovis with her husband and their son, T. Their daughter either had been sent, or soon would be sent, to live with Schuster's parents in Missouri. Schuster owned a business, Central California Research Laboratories (CCRL), in Fresno. Timothy was a manager in the cardiology department at Saint Agnes Medical Center (Saint Agnes).

Schuster and Timothy separated acrimoniously in 2002. For a while, they maintained separate living quarters in the family residence. Schuster complained about this arrangement. From the time of the separation on, Schuster also acted as if the house and business were hers, and she did not want Timothy to have custody of T., or a relationship with him. She often said that she would like to see Timothy dead.

Around July 4, 2002, Timothy moved out of the house and into a condominium. Schuster was enraged that he left and took items from the house while she was on a trip. At one point, Schuster told a neighbor that she sometimes thought she should just kill Timothy and be done with it. She twice asked someone who came to her house to work on a barbecue if he would help her enter Timothy's residence and retrieve some property.

On August 8, 2002, Schuster had Leslie Fichera, a chemist at CCRL, rent a storage unit at Security Public Storage, which was a couple miles from the lab. Schuster said she wanted to store some things that she wished to keep hidden

---

[4] The Court relies on the California Court of Appeal's February 28, 2011 opinion for this summary of the facts of the crime. See <u>Vasquez v. Kirkland</u>, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

2

from Timothy. Fichera rented unit A–182 in her own name, then turned the entry code and instructions over to Schuster.

On August 10, 2002, Timothy returned home from a trip to find his residence ransacked and items he had shared with Schuster gone. Also missing was a report he had been using to document his involvement with T. for custody purposes. Schuster subsequently admitted to various people that she and Fagone were responsible.[5] Schuster laughed about it. She told her manicurist that she had gone back a couple of times because it gave her a feeling "better than sex" to sit in a chair and see what she had done to the place. She also said she keyed Timothy's pickup, and that it was like a trophy and gave her a happy feeling every time she saw the key mark on the side of the truck.

After the break-in, the couple's relationship deteriorated further. Timothy moved to a house in Clovis that was equipped with an alarm system and motion sensors. He expressed concern about Schuster and obtained a handgun and concealed weapon permit.

Schuster told her manicurist that she prayed every night that Timothy would die. She asked Fichera if Fichera's boyfriend knew anyone who could rough up somebody. Schuster told a fellow member of her church choir that she would do everything in her power to keep Timothy from getting the business. She asked the barbecue repairman if he would go to Timothy's house, stun him to the ground with a stun gun when he answered the door, and then flag her down, where she would be waiting a couple of houses away.

On April 30, 2003,[6] a blue 55–gallon barrel was purchased and sent to CCRL, although it was not the type of barrel the lab normally used. Schuster said it was for yard clippings, although she asked a lab employee if he thought a body would fit in it. A couple of times, Schuster told this same employee that if she could kill Timothy and get away with it, she would, and she once asked if the employee knew anyone who would rough up Timothy or kill him. The employee took these various remarks as jokes.

Although CCRL had hydrochloric, sulfuric, and acetic acid on hand, very little was used. In Fichera's experience, probably no more than one bottle of hydrochloric acid would be used in an entire year. Between June 13 and July 2, however, CCRL purchased, through orders placed by Schuster, three cases of hydrochloric acid and one case of sulfuric acid. Each case contained six 2.5–liter bottles.

In June, Schuster told her manicurist that she could kill Timothy and get away with it, and that she knew people who could do it. That same month, a neighbor saw Schuster moving a blue barrel to the side of her garage.

Around July 9, Timothy and his good friend and coworker, Mary Solis, lost their jobs at Saint Agnes. Schuster laughed when she heard the news. On the evening of July 9, Timothy had dinner with Mary and Bob Solis and Victor Uribe, Jr. The Solises arranged to meet Timothy the next morning, and he left their home around 10:00 p.m. He, however, did not meet them the next morning or show up for his scheduled exit interview at the hospital.

---

[5] Fagone, who was in his 20's, was a lab assistant at CCRL for part of 2002. After he quit, he often babysat T. and performed other tasks for Schuster.

[6] Further references to dates in the statement of facts are to dates in 2003, unless otherwise specified.

Uribe went by Timothy's house; Timothy's pickup was in the garage, but no one answered the door. The police were summoned. A cursory search of the house revealed nothing overtly suspicious. Although there were no signs of forced entry or a struggle, the Solises' concern grew upon learning Timothy was not in the house, but his cell phone was on the dresser. Timothy would not be late to something as important as the exit interview, and he always carried his cell phone in case his children needed him. Nevertheless, the Solises were told they had to wait 24 hours to file a missing person report.

Around this same time, a CCRL employee noticed the blue barrel was gone. He also noticed a bottle of chloroform on top of the acid cabinet. When he asked, Schuster confirmed it was what doctors used to soak rags in to knock people out.

When Schuster arrived at work on Thursday morning, July 10, she was complaining about her shoulder. She said she had hurt it by working out earlier that week. That evening, Timothy did not show up for the scheduled exchange of custody of T. Schuster told her manicurist that she had a feeling the divorce was finally going to go her way.

The next morning, Friday, July 11, Robert Solis filed a missing person report with the Clovis Police Department. In response, Officer John Willow went to Timothy's house. He found a gun underneath a cushion on a chair near the front door. Locating a cell phone in the bedroom, he called every number to see if anyone had had contact with Timothy. When he contacted Schuster that afternoon, she said she had not heard from Timothy. After Willow had contact with Schuster's manicurist, who provided information regarding the volatile divorce that was pending, the matter was turned over to detectives for further investigation.

When Detectives Vincent Weibert and Larry Kirkhart entered Timothy's house later that afternoon, they found some damage to the "pony wall" behind the chair on which the gun was found, as if the chair had been forcibly pushed into the wall. Inside a briefcase in the same room was a microcassette recorder and tape.[7] The caller ID record for the telephone in the master bedroom showed only one call received, at 2:02 a.m. The call was from Schuster's cell phone number. Kirkhart subsequently arranged for Schuster to come to the police department to speak with the detectives. She was accompanied by a friend.

During the interview conducted by Kirkhart and Weibert, Schuster related that she and Timothy were going through a divorce and had a difficult time communicating verbally.[8] They sometimes went for three weeks without talking or exchanging e-mails. Schuster stated that the last message she got from Timothy was on Tuesday the 8th, and it said he was planning to pick up T. at 6:00 p.m. on Thursday. When Timothy did not show, Schuster and T. both tried unsuccessfully to contact him. Schuster noted that she was leaving with T. on Sunday morning for a two-week vacation, and Timothy always gave her trouble whenever she wanted an extra day.

---

[7] The recording contained messages Schuster had left on Timothy's answering machine, apparently in 2002. In many of them, Schuster called Timothy vulgar names and cast aspersions on his masculinity and demanded the return of certain items of property. On one occasion, she threatened to have his nursing license removed. On another, she said she hated his guts and hoped he burned in hell.

[8] A video recording of the interview was shown to the jury. As Schuster was very talkative and volunteered information on a number of subjects, there was much more conversation between her and the detectives than we summarize here.

Schuster related that she learned that Thursday evening about Timothy losing his job. Concerned, she called him again around 8:30 p.m. and left a message asking him to call. The last time she called Timothy that night was around 10:30 p.m. She drove by his house and knocked on the door at about 10:30 or 10:45 p.m., after which she did not try to contact him further at his home or by telephone. Schuster related that she last saw Timothy in person on Saturday, July 5, and spoke to him last about a month or two before that.

When asked where she was on Wednesday, the last day the Solises saw Timothy, Schuster replied that she had worked all day. As her shoulder was bothering her, she and T. watched a Weird Al Yankovic movie that evening. She fell asleep on the couch. When she awoke, it looked like her cell phone had been dialed, and she thought she must have rolled over and hit a button or something. Asked if she had Timothy's number on speed dial, Schuster said she thought so. Schuster denied talking to Timothy or calling him intentionally. Weibert asked if her cell phone was handy, but she said it was at home.

Weibert then informed Schuster that the last incoming call at Timothy's house was from her cell phone number. He suggested that if she had some conversation with Timothy about child custody or money, that, together with his losing his job, might have been enough to push him over the edge. Schuster insisted that she had no information and did not have a conversation with him.

After a discussion concerning whether Schuster had someone to help her through this and whether the police chaplain might help, Kirkhart offered to give Schuster a ride home. She responded that she had her car. Kirkhart then offered her water and left the room to get it for her. Weibert also left the room.

Weibert thought Schuster's story of accidentally making the telephone call while asleep was unusual, as was her statement that she had not brought her phone. He went to speak with the friend who had accompanied Schuster, but found no one. The only vehicle parked in front of the police department was Schuster's Lexus. Looking through the car window, Weibert saw a cell phone on the center console. When he called Schuster's number, the cell phone rang. Weibert informed Kirkhart.

Kirkhart told Schuster about finding her cell phone and asked if he could confirm her story about the speed dial. She agreed and accompanied detectives to the car. At her request, she was allowed to retrieve the phone. Walking back to the interview room, however, she appeared nervous. Her hands were shaking and she was trying to manipulate the phone. Concerned that she might try to change some of its contents, Weibert asked if he could see it. Schuster handed it to him.

Back in the interview room, Weibert determined that none of the speed dial numbers belonged to Timothy. Schuster asked for water; the detectives left the room but monitored her from another location. She apparently retrieved her messages.

When Weibert returned, Schuster claimed that she had found Timothy's number under T.'s name, but had accidentally just deleted it. Later, however, she admitted that she had made the call to Timothy's house. She explained that she just wanted to make sure there would be no trouble on Saturday, because she was afraid Timothy would not return T. from visitation in time for the trip. Schuster said Timothy was kind of asleep, and she estimated the call was less than 30 seconds

long. Schuster said she had made a mistake by not telling the detectives, denied being deceitful about anything else, and stated she did not know what could have happened between the time of the phone call and the time of Timothy's appointment. After further discussion about a church Schuster and Weibert had both attended, how the detectives could reach Schuster while she was out of town, and how she had been praying for Timothy, arrangements were made for Schuster to bring Kirkhart a notebook she discovered that Timothy had been keeping about her. The interview then ended.

The next morning, Tami Belshay, who had accompanied Schuster to the police department, went to Schuster's house. Schuster was upset that the police had caught her in a lie and worried that they might tap her phones or put a tracking device on her car. She said that if they did, they would know she went to the lab at about 2:00 or 3:00 that morning. Schuster said she had gone to put on a sample run for Fichera.

When Belshay informed Schuster that the police could get search warrants for the lab and her home even though Schuster would be on vacation, Schuster asked Belshay to stay while she went to Fagone's and got T.'s bicycle. When she got there, she told Anthony Fagone, Fagone's father, that she had come to talk to Mrs. Fagone about some baskets she had ordered. Told Mrs. Fagone was not home, Schuster insisted that she wanted to talk to Fagone and almost tried to force her way in before getting the bicycle and leaving.

When Schuster returned home, Belshay remarked that the police would take Schuster's computers and that anything deleted would still be on the hard drives. Shortly after, Schuster asked Belshay to watch T. while Schuster went to the lab to pay some bills. She seemed harried and frantic. Belshay stayed at Schuster's house until 2:20 p.m. Sometime between noon and 2:00 p.m., Fagone came by. He walked in without knocking or ringing the bell, went upstairs, came back down very quickly, and then left. He did not respond when Belshay spoke to him, and he looked pale and sick.

After going to the lab, Schuster contacted Fichera and asked for help finding a truck with a lift gate. Schuster said she needed it to loan a rototiller to a friend. Ultimately, they went to the U–Haul location on Blackstone between Bullard and Sierra, and Fichera rented a truck in her own name. They left the U–Haul location separately, with Fichera driving the rental truck.

Schuster met with Kirkhart at approximately 4:00 p.m. at Herndon and Blackstone to give him Timothy's notebook. She was under surveillance at the time. She drove home at a high rate of speed. Once there, Fagone arrived with T. Schuster then left, again driving so fast that surveillance had to be terminated for safety reasons.

Schuster picked up the rental truck from Fichera. Schuster was in a rush. About 50 minutes later, she called Fichera and told her to meet her at the U–Haul place. Security Public Storage records showed an entry into and exit from unit A–182 during the time Schuster had the rental truck. No other entry was made into that unit between July 9 and 14.

At the U–Haul place, Fichera observed that Schuster was thirsty and dirty, had scrapes on her shins, and had blood on her shoe from what Schuster said was a smashed toe incurred while loading the rototiller. Fichera also noticed that the truck's hand dolly had been used and that only 15 miles had been put on the truck.

Schuster could not have driven the truck from Fichera's residence to Clovis and back and had it register only 15 miles.

Schuster and T. left on their trip on Sunday morning, July 13. She told an acquaintance coincidentally on the same flight that she had gone to the lab early that morning because she had forgotten something. On Monday, July 14, Fichera found an envelope on her desk at the lab, on which Schuster had written "'thanks.'" Inside was a check, dated July 8 and signed by Schuster, in the amount of $510.25. The memo portion indicated it was reimbursement for travel and lodging, but the only money Schuster owed Fichera was approximately $40 for the rental truck.

Fichera and Belshay went to the police on July 14. That evening Kirkhart obtained search warrants for the storage unit, the lab, and Schuster's house.

Inside the storage unit was a blue 55–gallon barrel that contained human remains. They were subsequently identified, through DNA testing, as those of Timothy. Only the lower half of the body remained; it had been placed into the barrel head down and was floating in fluid that contained hydrochloric acid. The body was in a state of early decomposition, with the time of death possibly being July 9 through 11. Tissue samples tested positive for chloroform, an anesthetic type of substance that can cause rapid loss of consciousness and incapacitation.

The cause of death was the probable combined effects of acute chloroform exposure and hydrochloric acid immersion, although it was very possible that death resulted solely from the chloroform. It could not be determined whether Timothy was alive when he was placed in the barrel.

A can of Lysol air freshener was found on a refrigerator inside CCRL. Such a product would not be used in the lab for fear of contaminating the analyses being performed. Toward the bottom of the dumpster in a locked enclosure behind the lab was a case of six empty bottles of hydrochloric acid. Forensic analysis of Schuster's office computer showed that on June 13, Internet searches were conducted for the terms "'acid digestion tissues,'" "'acid digestion animal tissues,'" and "'sulfuric acid.'"

Schuster was arrested on July 16. In her possession were two receipts from a store about halfway between CCRL and Security Public Storage. Both showed purchases made just after 7:30 p.m. on Saturday, July 12, including Lysol and other air fresheners. Also in Schuster's possession was a card with the storage facility entry instructions and a code number.

***DEFENSE EVIDENCE***

The thrust of Schuster's defense was that Fagone killed Timothy.

The manager of Security Public Storage told a defense investigator that she saw a U–Haul truck drive in on Saturday, July 18. She was positive it contained two males. The driver was in his early 20's; the passenger was younger and had a skimpy beard. When she checked the dumpster later that day, she smelled the same smell as when the storage unit was first opened by the police. She believed the smell was coming from a black plastic garbage bag that she thought contained body parts and that she felt had come from the U–Haul.

Dr. Paul Herrmann, a medical doctor specializing in forensic pathology, reviewed various materials and photographs in connection with this case. In his opinion, Timothy's body was cut in half before it was immersed in acid, and the other half was not dissolved in the barrel. Herrmann questioned the completeness of the police investigation, particularly the lack of forensic evaluation to determine if there was blood residue at Schuster's or Timothy's residence.[9]

A couple of months before Fagone's arrest, he told a friend that someone wanted him to chloroform her husband and rob him. He never implied, however, that Schuster wanted him to kill her husband. Fagone also took this friend to the Tower District to show him a house he had rented. He said Schuster had helped him obtain the house and was going to pay for his rent.

In May or June, Fagone asked another friend to go up to Timothy's door, knock, and then taser Timothy in the neck. Fagone wanted to knock Timothy out and tie him up so that he could rob him. Although Fagone said Schuster was paying him to do this, he never said she wanted him to kill Timothy.

Matthew Crowder, another of Fagone's friends, recalled Fagone joking about chloroforming someone or disposing of someone in a barrel of acid. These were running jokes within the group of friends. Although Fagone never said anything about Schuster wanting to hurt her husband, he said Schuster was upset because her husband was taking all her money and property. Fagone also was upset because he was siding with Schuster. In June, Fagone was injured in a motorcycle accident. In light of his physical condition, Crowder did not believe he could personally subdue a person such as Timothy. In Crowder's opinion, Timothy was fairly passive and nonviolent and easily could be led by people he felt had more power and prestige. Fagone said Schuster was a powerful person with the money and means to be able to do stuff.

Dr. Stephen Estner, a forensic psychiatrist, opined that Schuster manifested battered spouse syndrome (BSS) in the context of this case. He concluded she was "traumatized to an enormous degree," and that there was emotional abuse that caused physical symptoms.[10]

Schuster testified and denied killing Timothy, whom she married in 1982. She detailed the early, happy days of their marriage, followed by the deterioration of their relationship and her ultimate decision to file for divorce in 2002. She also described heart palpitations and other physical symptoms she suffered due to stress, as well as her feelings about, and response to, Timothy's moving out of the family home while she was gone and taking community property when a property division had not been decided. She admitted she broke into his home and took things in August of 2002 out of retaliation, although she denied keying his truck. She also related how Timothy attempted to use the child custody order against her on a number of occasions.

Timothy first introduced Schuster to Fagone's parents in 2001 or 2002. Fagone went to work for Schuster at CCRL and later became T.'s babysitter. He also did things in and around the house for her, so he had a key. Schuster trusted him, and she paid him for his work.

---

[9] In rebuttal, the prosecution presented expert witnesses who disagreed with Herrmann's conclusions.

[10] We will discuss Estner's testimony in more detail in conjunction with Schuster's claim of ineffective assistance of counsel, which we address *post.*

Schuster admitted talking to a number of people concerning how she felt about Timothy. When she said that she wished he were dead and similar things, she did not mean it literally. She also vented about the situation to Fagone, as venting was her escape from the enormous pressures she was under at the time.

In 2003, she was concerned most about Timothy's threat to try to get sole custody of T. Timothy also had demanded $1 million for his half of the business. These subjects were discussed when Schuster vented to Fagone and others. As of July 9, Fagone had not expressed to Schuster any hostility toward Timothy.

Around June, Schuster made plans to take T. on a long vacation trip to Texas, Florida, and Missouri. They were scheduled to be gone for approximately two weeks beginning July 13. The trip was extremely important to both of them. It was a dream vacation for T. The custody agreement gave Schuster the right to two weeks of vacation every summer, but she expected Timothy to try to undermine the trip at the last minute.

On July 9, Schuster received a telephone call from her attorney's office asking her to stop by the next day to sign a stipulation and order concerning her vacation period with T. Schuster had had no idea Timothy's attorney was going to prepare something, but it made her feel like things would be okay with the trip. She was still worried, however, that Timothy would not bring T. back from visitation in time for them to make their 6:30 a.m. flight on July 13.

July 9 was a normal workday for Schuster. That evening Fagone came over and they all watched a Weird Al Yankovic movie. Fagone left sometime after midnight.

Schuster placed a call to Timothy around 2:00 a.m. on July 10. She called because she still was upset about the stipulation and order. She wanted to make sure Timothy did not have anything "up his sleeve" and that T. was going to be back in her custody so they could get on the plane Sunday morning. Timothy and Schuster had a very brief conversation. Schuster initially forgot about making this call when she was interviewed by the police; when she remembered, she was dishonest because she feared the police would detain her and make her a suspect. This was within 24 hours of leaving on the trip, and she knew she could not, under any circumstances, deny her son that vacation.[11]

On Thursday, July 10, Schuster went to her attorney's office to sign the stipulation and then on to work. Fagone was with T. most of the day. Schuster had a standing appointment to get her nails done every Thursday at 5:30 p.m. T. went with her to the nail appointment, but Timothy failed to pick him up at the nail salon as per the standing visitation arrangement. As Schuster and T. were leaving the salon, Schuster ran into a friend who told her that Timothy and Mary Solis had lost their jobs at Saint Agnes earlier that week. This came as a shock to Schuster. She and T. both made a number of calls to Timothy's home and cell phone, trying to find out what was going on. Schuster went by Timothy's house between 10:30 and 11:00 p.m., even though she felt uncomfortable doing so given that they were not getting along well.

---

[11] Cell phone records showed that at the end of the 22–second call, the tower handling the call switched to one closer to Timothy's house than the originating tower. Schuster denied driving to Timothy's house; she was home when she made the call.

Friday, July 11, was another workday for Schuster. She heard nothing with regard to Timothy's whereabouts. She was concerned and did not know what was going on or whether he was trying to undermine the trip. She was focusing on T. and his trip and trying to do everything possible to make sure he was not going to be disappointed.

At some point that day, Schuster was asked to talk with members of the Clovis Police Department. She agreed to do so. She arrived at the police station around 10:00 p.m., after she had made arrangements to have Fagone look after T. She did not leave the police station until between 1:00 and 2:00 a.m. She was physically exhausted. Emotionally, she was very upset. She was angry because she thought this could be something Timothy was trying to do to undermine the vacation and that she was not going to be able to go with T. She also was scared that, if this was a disappearance as the police said, they were going to detain her and keep her from going on the trip.

When Schuster got home, she believed T. was in bed, asleep. Fagone was there, and she told him what took place at the police department and how she felt they were trying to make her a suspect and about her anger that the trip might be jeopardized. Fagone was talking at the same time she was ranting and venting, and she heard him say something like there had been an accident and Timothy was dead and that "they" had killed him. She thought it was a sick joke, then realized she had heard correctly. When Fagone said Timothy's body had been stashed in her garden shed on the side of her house, she became almost hysterical. She considered reporting it to the authorities, but she was not thinking logically. She told Fagone that he had to move the body now, and she did not care how he did it. She believed Fagone left shortly after.

Schuster received a telephone call from Belshay early on the morning of July 12. Belshay then came to the house. While Belshay was there, Schuster went to the home of Fagone's parents, which was nearby, and retrieved T.'s bicycle. She also wanted to make sure Fagone had taken the body out of her shed. Fagone told Schuster that he had put the body in a barrel in the warehouse section of her lab. Schuster considered notifying the police, but feared she would be prevented from going on the trip. In hindsight, she knew she made some bad decisions, but she was overwhelmed at the time.

Schuster told Fagone that the barrel could not stay at the business. He said the only way he could move it was if she helped him get a truck with a lift gate. She agreed to try. Frantic, she called Fichera for help. They eventually obtained a rental truck, which Schuster picked up from Fichera after giving Kirkhart Timothy's journal and going home briefly.

Schuster drove the truck to the lab, where Fagone was waiting with a couple of other individuals. Schuster and Fagone went into the warehouse, and she cleared a pathway so he and his companions could get the barrel out of there. She then went to her office and did other things. Fagone had mentioned that he did not know where to take the barrel, so Schuster suggested temporarily taking it to her storage unit. She made him promise, however, that he would take care of moving it somewhere it could not be found. He assured her that he would do that.

When the truck left for the storage facility, Schuster followed in Fagone's car and waited near the facility. The truck came out of the storage facility, Schuster and Fagone traded vehicles, and she went directly to the U–Haul center. Fichera met her there. At some point, Schuster stopped at a store to get some cleaning supplies

and air freshener, as she had noticed an odor from the barrel in the warehouse area of the lab.

When Schuster returned home, T. was there. Schuster said nothing to him about his father. She knew she would have to be accountable at some point, but was just thinking a day at a time.

Schuster denied purchasing large quantities of acid in the spring of 2003 in order to dispose of Timothy's body. Instead, they were for an exhaustive project that had to be done occasionally involving cleaning all of the glassware in the lab. Schuster ran the Internet searches because she was looking for information on which acids would remove inorganic and organic materials.[12]

Schuster denied purchasing the blue barrel in order to dispose of Timothy's body. She did not recall ordering it, although she remembered it coming into the lab. She was surprised that it was bigger than she thought she had ordered. One of her employees, who knew the stress she was under from the divorce, jokingly said he thought a body might fit in it. Schuster never took it home.

After Schuster learned of Timothy's death, she allowed T. to go with Fagone in Fagone's vehicle. Schuster felt she probably was not making sound judgments that day, but Fagone had said Timothy's death was an accident, and Schuster never believed he would hurt T. The plan was for Fagone to take T. to a picnic and then meet Schuster at the lab to move Timothy's body.

An abstract of judgment dated February 20, 2007, showed Fagone was convicted of first degree murder and residential burglary. He was sentenced to life in prison without the possibility of parole. Fagone did not testify in Schuster's trial.

Schuster never solicited Fagone to talk to his friends about robbing or chloroforming or using a stun gun on Timothy. Fagone never told her that he purchased a stun gun from Herb Bauer's Sporting Goods on June 20.[13] She never directed Fagone to kill Timothy. She did not provide him with chloroform. She did not recall ever discussing the substance or its effects with him.[14] She never told him that she would pay for the house he found in the Tower District, although she gave him a $2,000 cash advance against the work he did for her, such as watching T. and the house, so he would be able to move in.

Schuster, 2011 WL 680211, at *1–9 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

---

[12] Expert witnesses disagreed about the use of aqua regia, the mixture of hydrochloric and nitric acids discussed by Schuster, to clean glassware, and the quantity of that solution that would be required to clean the amount of glassware at CCRL. People who would have expected to be informed if such a mass cleaning project were planned received no such information from Schuster.

[13] During a search, a receipt for a stun gun and two batteries was found attached to a bulletin board in Fagone's room.

[14] A search of the hard drive on Fagone's computer showed that the operator repeatedly typed "'can chloroform make you pass out'" in connection with a Web site called Ask.com.

or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 (2000). Petitioner asserts that she suffered violations of her rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Fresno County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>Harrington v. Richter</u>, 562 U.S. 86, 97–98 (2011); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70–71 (2003); <u>Williams</u>, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id.</u> In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2009) (quoting <u>Wright v.</u>

1  Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

2  Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an

3  end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552

4  U.S. at 126; Moses, 555 F.3d at 760.

5      If the Court determines there is governing clearly established Federal law, the Court must

6  then consider whether the state court's decision was "contrary to, or involved an unreasonable

7  application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C.

8  § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

9  state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

10  of law or if the state court decides a case differently than [the] Court has on a set of materially

11  indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The

12  word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character

13  or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New

14  International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to

15  [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

16  governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

17  clearly established Supreme Court precedent, the state decision is reviewed under the pre-

18  AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

19      "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

20  the state court identifies the correct governing legal principle from [the] Court's decisions but

21  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

22  "[A] federal court may not issue the writ simply because the court concludes in its independent

23  judgment that the relevant state court decision applied clearly established federal law erroneously

24  or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

25  538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists

26  could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

27  Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the

28  correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If

the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state courts reach a decision on the merits but there is no reasoned decision, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

///

///

14

**IV.**

**REVIEW OF CLAIMS**

**A.  <u>Miranda</u> Violation**

In her first claim for relief, Petitioner asserts that the statements she made to police in her

July 11–12, 2003 interview were taken in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

(ECF No. 4 at 21). [15] Respondent argues that the state court reasonably denied relief on

Petitioner's <u>Miranda</u> claim. (ECF No. 130 at 22).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate

District, which denied the claim in a reasoned opinion. The California Supreme Court summarily

denied Petitioner's petition for review. As federal courts review the last reasoned state court

opinion, the Court will "look through" the California Supreme Court's summary denial and

examine the decision of the California Court of Appeal. <u>See</u> <u>Wilson</u>, 138 S. Ct at 1192.

In denying Petitioner's <u>Miranda</u> claim, the California Court of Appeal stated:

> Prior to trial, Schuster unsuccessfully sought to suppress the statements she made

> to police in the interview of July 11 through 12 as having been taken in violation
> of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).[16] On appeal, she contends

> the interview became custodial when detectives discovered her cell phone in her
> car; hence, *Miranda* advisements should have been given at that point, and failure
> to do so should have resulted in suppression of all evidence of statements and

> events occurring after that point. We disagree.

> ### *The Trial Court Proceedings* [17]

> At the hearing on the suppression motion, Weibert testified that on the evening of

> July 11, he and Kirkhart were investigating Timothy's disappearance. Timothy
> had been reported as a missing person, and the detectives were trying to find out

> what had happened to him. At that point, they did not know if he had left town,
> become the victim of foul play, or possibly harmed himself.

> The detectives wanted to talk to Schuster about some of the things they had found

> in the search of Timothy's home. Accordingly, Kirkhart contacted her by phone
> and made arrangements for her to come down to the police department to speak to

> them. Weibert initially understood Schuster had obtained a ride from someone,
> but later determined she drove herself. She arrived at the police department about

> 10:00 p.m. and was ushered into the interview room. At no time was she advised
> of her *Miranda* rights.

[15] ECF page numbers refer to the page numbers stamped in blue at the top of the page.

[16] Schuster also raised Fourth and Sixth Amendment grounds that she does not now repeat.

[17] The content of Schuster's interview with police is summarized in the statement of facts, *ante*. We focus here on

the circumstances surrounding the interview. We have viewed and considered the video recording, as did the trial
court. There is no video of what occurred outside the interview room.

At the time the detectives were conducting the interview, they knew that the last phone call Timothy had received was from Schuster's cell phone. When Schuster was asked to come to the police station, she was not a suspect, however, because the detectives did not know what had happened to Timothy. Their concern with the last phone call was that Timothy might have said something to Schuster that would shed light on where he could have gone or on his state of mind.

During the interview, Schuster was asked specifically whether she had brought her cell phone with her, and she said she had not. When Weibert discovered the phone was in her car, he believed it was possible Schuster had not been truthful about bringing it, but she also could have forgotten.

Schuster and the two detectives walked outside. Schuster unlocked her vehicle and retrieved the cell phone. The detectives were speaking with her about it when her demeanor changed. She began to appear nervous. Her hands began shaking and her voice changed pitch. She began to open the cell phone and acted as if she were going to manipulate it. Concerned that she might try to change or delete entries in the phone, Weibert asked if he could see it and she handed it to him. Weibert asked politely; he did not order or demand it.

Weibert began checking the speed dial numbers programmed into Schuster's phone as the three were walking back to the interview room, because of Schuster's statement that she had Timothy's number on speed dial and had accidentally called him. He completed his inspection while they were inside. He estimated that the entire process of retrieving and checking the phone took no more than five to 10 minutes. During that time, Schuster never expressed a desire to end the interview, nor did she ask Weibert to return the phone to her.

Eventually, Schuster admitted having made the call and that what she previously told the detectives was not true. Prior to that, Weibert remembered Schuster saying she was tired, but did not recall her indicating a desire to leave. Schuster did say she had taken some Vicodin that day and had no moisture in her mouth. Both detectives encouraged her to speak with a chaplain concerning this matter. Before she admitted making the phone call, Schuster asked if the chaplain was coming in, was assured by Weibert that he would be there soon, and asked for some water. The interview ended when the police chaplain came into the room.

When Schuster admitted having made the phone call and previously being untruthful with the detectives, Weibert still was looking at the possibility that Schuster might have said something to Timothy that evoked a response from him or that some foul play could have befallen him and she might know something about it. To say Schuster was a suspect when the detectives did not know they had a crime "might be a little premature," however.

Weibert believed that the chaplain spoke with Schuster for a while. Weibert was not present and did not know how much longer Schuster stayed at the police department. He believed the interview lasted about two to two and a half hours. At no time was Schuster in custody or not free to leave.

At the conclusion of the hearing, the trial court found (1) Schuster's encounter with the police was consensual, (2) a reasonable person in the same situation would have understood he or she was free to go, and (3) Schuster understood she was free to go and was going to leave when the interview was over. Because there

was no custodial interrogation, no *Miranda* warnings were required. The trial court then ruled the statements were admissible in the prosecution's case-in-chief.

### *Analysis*

In *Miranda, supra,* 384 U.S. at page 444, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.... Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."[18]

Schuster's claim that *Miranda* was violated rests on her assertion that she was subjected to an unwarned custodial interrogation from the point at which police discovered her cell phone in her car. We assume, and the People do not dispute, that the interview constituted "interrogation" within the meaning of *Miranda*. (See *Rhode Island v. Innis* (1980) 446 U.S. 291, 301.)

" 'Absent "custodial interrogation," *Miranda* simply does not come into play.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) "[C]ustodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." (*Miranda, supra,* 384 U.S. at p. 444.) "Whether a person is in custody is an objective test; the pertinent inquiry is whether there was ' " 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " ' [Citation.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) "Two discrete inquires are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." (*Thompson v. Keohane* (1995) 516 U.S. 99, 112, fn. omitted.)

"In deciding the custody issue, the totality of circumstances is relevant, and no one factor is dispositive. [Citation.]" (*People v. Boyer* (1989) 48 Cal.3d 247, 272, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1; see *California v. Beheler* (1983) 463 U.S. 1121, 1125.) Important considerations include the site of the interrogation, whether objective indicia of arrest were present, and the length and form of the questioning. (*People v. Boyer, supra,* at p. 272.) What matters are the objective circumstances of the interrogation, not the subjective views harbored by the interrogating officers or the person being questioned. (*Stansbury v. California* (1994) 511 U.S. 318, 323.)

"Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave'

---

[18] In *Harris v. New York* (1971) 401 U.S. 222, 225–226, the high court held that, although the prosecution may not introduce unwarned statements as part of its case-in-chief, such statements may be used to impeach a defendant's inconsistent testimony.

[citation]." (*People v. Leonard, supra,* 40 Cal.4th at p. 1400; see *People v. Mayfield* (1997) 14 Cal.4th 668, 733.)

We conclude, after independently considering the totality of the circumstances, that a reasonable person in Schuster's position would have felt free to terminate the interview and leave at all times during questioning.

Schuster came voluntarily to the police station and provided her own transportation, and no one suggested that she was, or might be placed, under arrest. (Compare *Yarborough v. Alvarado* (2004) 541 U.S. 652, 664, *Oregon v. Mathiason* (1977) 429 U.S. 492, 495 and *People v. Stansbury, supra,* 9 Cal.4th at pp. 831–832 with *People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1481.) The interview having occurred at the police department does not, without more, render it custodial. (*California v. Beheler, supra,* 463 U .S. at p. 1125; *People v. Stansbury, supra,* at p. 833; *People v. Boyer, supra,* 48 Cal.3d at p. 272.) The video of the interview shows that when both detectives were present, Schuster was seated in a corner of the interview room with one detective sitting to either side, forming a sort of triangle. Neither detective ever was positioned between Schuster and the door or in such a way as to make her feel hemmed in.

Of course, "[i]f an individual voluntarily comes to the police station ... and, once there, the circumstances become such that a reasonable person would not feel free to leave, the interrogation can become custodial." (*United States v. Kim* (9th Cir.2002) 292 F.3d 969, 975.) Here, however, although the detectives never told Schuster she was free to leave, they implied this was so even after her cell phone was discovered in the car by telling her that the chaplain was on the way.

The chaplain was not used as a ruse to keep Schuster talking; she was asked if she wanted to speak to him and, if so, whether she wanted to do it that night and at home or at the police station. The decision to speak to him that night at the station, although made before she was told her cell phone had been discovered, was hers alone. Also, after Weibert went through the numbers programmed into the speed dial positions on the phone, Schuster was left alone to make calls or retrieve her messages, further indications that she was not in custody. (Compare *People v. Leonard, supra,* 40 Cal.4th at p. 1401 with *People v. Esqueda, supra,* 17 Cal.App.4th at p. 1481.)

Significantly, even after Schuster's deception came to light, the detectives remained polite and their tones of voice were conversational rather than accusatory. Even when Weibert expressed skepticism about Schuster's story that she accidentally dialed Timothy's number in her sleep, his tone was not harsh or intimidating.

Rather than expressly accusing Schuster of lying, Weibert suggested she had made a mistake and it would be worse if she lied about it. He did not threaten her with arrest and prosecution, but rather urged her to tell the truth, especially for T.'s benefit. (See *Yarborough v. Alvarado, supra,* 541 U.S. at p. 664.) He did not suggest that her deception had made her a suspect, but instead explained that he wanted to know the reason behind the call, and that maybe she said something to Timothy that was taken the wrong way. His tone was persuasive rather than demanding or insistent.

Although Weibert asked very specific questions once Schuster admitted making the call, his tone never grew stern or accusatory. When Schuster explained why she initially denied making the call, Weibert asked whether she had been deceitful

about anything else, but appeared to accept her explanation of why she had been untruthful, as well as her assurance that she had not been untruthful about anything else. He then proceeded to ask, in a conversational manner, what she thought might have happened, whether she heard anything in the background during the call, and how Timothy sounded. When Schuster said she was tired, Weibert assured her that they would get her out of there in just a second, but they were still waiting for the chaplain to show up.

That police catch an interviewee in a lie and pointedly question him or her about the deception does not, in our view, transform a noncustodial encounter into custodial interrogation. This is especially true here, where the overall tone of the interview never changed, and there was nothing in the detective' questions or demeanors to suggest they suspected Schuster of a crime or that she was no longer free to leave. That the discovery of Schuster's deception may have resulted in a prolongation of the interview is not dispositive, nor is the length of the encounter. (See *Yarborough v. Alvarado, supra,* 541 U.S. at p. 665.)[19]

None of the detectives' comments conveyed to Schuster that she was a suspect in a crime, although it was one scenario they had to consider. The detectives did not know that any sort of crime had been committed, even though their affidavit for the search warrant for Timothy's house stated there was sufficient motive present for foul play to befall Timothy at the hands of Schuster or someone looking out for her. They made it clear to Schuster that they did not know what had happened and were exploring several possibilities. "[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear on the question whether the individual is in custody for purposes of *Miranda.* [Citation.]" (*Stansbury v. California, supra,* 511 U.S. at p. 324.)

Schuster argues that once she was caught in a lie about something that clearly was important to the police, neither she nor a reasonable person would have believed she was still free to leave. We disagree. The detectives gave the clear impression they were accepting her explanations, both as to the circumstances under which she made the phone call and why she initially was untruthful. Moreover, Schuster clearly knew she was free to leave, otherwise she would not have mentioned that she was going out of town soon and then made arrangements for how the detectives could get in touch with her. That she verified she did not have to wait for the detectives to return once she and the chaplain were finished does not change this or, more importantly, what a reasonable person in her position would have believed. Significantly, Schuster was allowed to leave the station—indeed, the state—without hindrance following the interview. (See *Oregon v. Mathiason, supra,* 429 U .S. at p. 495; *People v. Leonard, supra,* 40 Cal.4th at p. 1401.)

Schuster relies in part on *People v. Aguilera* (1996) 51 Cal.App.4th 1151 as support for her claim of custodial interrogation. *Aguilera* does not help her. There, one of the interrogating officers initially said the defendant was not in custody, but the officer then explained that the interview would end and they would take the defendant home *after* he told them the truth. The officers repeatedly rejected the defendant's story, and told him that he would not be allowed to leave if they had to interview an alleged alibi witness. (*Id.* at pp. 1163–1164.) Moreover, the " 'tag-team' interrogation" was "intense, persistent, aggressive, confrontational, accusatory, and, at times, threatening and intimidating." (*Id.* at pp. 1164–1165.)

---

[19] The length of the interview was due in significant part to the amount of information Schuster volunteered—some of it tangentially relevant at best—in response to questions.

These factors distinguish *Aguilera* from the circumstances of Schuster's interview.

We believe *People v. Spears* (1991) 228 Cal.App.3d 1 (*Spears*) to be more persuasive. There, the appellate court concluded there was no custodial interrogation. The factors considered included (1) a portion of the questioning took place at the police station, (2) the interview was extensive, and it included a pointed question about the defendant's complicity in the crime under investigation, (3) the officers' tone was polite and not intimidating, (4) their questions were not accusatory and the defendant was not led to believe he was a suspect or that the officers considered him guilty, (5) the defendant was told several times that he was free to leave, and (6) he was allowed to return home at the close of the interview. (*Id.* at pp. 25–26.)

The circumstances here are virtually identical to those in *Spears.* Although the officers never expressly stated Schuster was free to go, that such was the situation was clearly conveyed, even after the deception about the cell phone came to light. A reasonable person in Schuster's situation would have believed, at all times, that she was free to terminate the interview and leave.

Schuster, 2011 WL 680211, at *10–15 (footnotes in original).

In Miranda v. Arizona, 384 U.S. 436 (1966), the United State Supreme Court held that before a suspect can be subjected to custodial interrogation, he must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. at 479. Miranda described "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444.

The Supreme Court has "repeatedly emphasized" that "whether a suspect is 'in custody' is an objective inquiry." J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011).

Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

Thompson v. Keohane, 516 U.S. 99, 112 (1995) (internal quotation marks, alteration, and footnote omitted). Thus, "the subjective views harbored by either the interrogating officers or the person being questioned" are not relevant. Stansbury v. California, 511 U.S. 318, 323 (1994) (per

curiam). "Courts must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 663 (2004) (quoting <u>Stansbury</u>, 511 U.S. at 322, 325).

The state court identified the following facts in determining that Petitioner's interview was noncustodial. Petitioner came voluntarily to the police station and arrived in her own vehicle. The seating arrangement in the interview room was not such that either detective was positioned between Petitioner and the door or in such a way as to impede Petitioner's access. After Detective Weibert went through the speed dial numbers on her phone, Petitioner was free to make calls and retrieve her messages. Petitioner's apparent knowledge of her ability to leave given that she mentioned going out of town and made arrangements for how the detectives could get in touch with her. The fact that Petitioner was allowed to the leave the station and the state without hindrance following the interview. <u>Schuster</u>, 2011 WL 680211, at *13–14.

The California Court of Appeal emphasized that "even after Schuster's deception came to light, the detectives remained polite and their tones of voice were conversational rather than accusatory." <u>Schuster</u>, 2011 WL 680211, at *13. The state court also found that "[n]one of the detectives' comments conveyed to Schuster that she was a suspect in a crime, although it was one scenario they had to consider." <u>Id.</u> at *14. Petitioner had argued before the California Court of Appeal that the detectives did suggest Petitioner was a suspect when Weibert informed her, "understand that if some foul play has befallen him, obviously one of the first places that people always point the finger is at the estranged spouse." (LD 5 at 36 (quoting 16 CT 4728)). Here, Petitioner argues that "[b]ecause the state court of appeal failed to address this argument, its decision is 'contrary to' the long line of Supreme Court precedent requiring courts to examine the totality of circumstances of an interrogation to determine whether it was custodial. 28 U.S.C. § 2254(d)(1)." (ECF No. 136 at 2).

In <u>Stansbury v. California</u>, the Supreme Court stated:

> Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects

21

are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

511 U.S. at 325.

Although the Ninth Circuit has found it "somewhat troubling" when a state court has failed to explicitly address the increasingly accusatory nature of a detective's questioning, "the omission does not render the court's application of federal law unreasonable." Stanley v. Schriro, 598 F.3d 612, 619 (9th Cir. 2010) (citing Oregon v. Mathiason, 429 U.S. 492, 494–95 (1977) (per curiam) (holding that a suspect was not in custody despite being informed that he was a suspect and confronted with fabricated evidence linking him to the crime)). Similarly, here, the California Court of Appeal's failure to explicitly address Petitioner's argument that the detectives did suggest she was a suspect does not necessarily render its application of federal law unreasonable.

Petitioner also argues that the state court's conclusion that "nothing in the detectives' questions suggested they suspected Ms. Schuster of a crime amounts to an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2)." (ECF No. 136 at 2). "A state court's decision is based on unreasonable determination of the facts under § 2254(d)(2)[20] if the state court's findings are 'unsupported by sufficient evidence,' if the 'process employed by the state court is defective,' or 'if no finding was made by the state court at all.'" Hernandez v. Holland, 750 F.3d 843, 857 (9th Cir. 2014) (quoting Taylor v. Maddox,

---

[20] A different provision of AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The Ninth Circuit's "panel decisions appear to be in a state of confusion as to whether § 2254(d)(2) or (e)(1), or both, applies to AEDPA review of state-court factual findings," Murray v. Schriro, 745 F.3d 984, 1001 (9th Cir. 2014), and the Supreme Court has not addressed the relationship between § 2254(d)(2) and (e)(1), Wood v. Allen, 558 U.S. 290, 300 (2010). However, the Court "need not address the interaction between § 2254(d)(2) and (e)(1) when the petitioner's claims fail to satisfy either provision." Atwood v. Ryan, 870 F.3d 1033, 1047 (9th Cir. 2017) (citing Murray, 745 F.3d at 1001). See Apelt v. Ryan, 878 F.3d 800, 837 n.23 (9th Cir. 2017) ("Indeed, it is difficult to imagine a case in which a court would find that a state court decision was 'an unreasonable determination of the facts,' but that the petitioner had not rebutted the 'presumption of correctness by clear and convincing evidence.'"), cert. denied, 139 S. Ct. 2716 (2019).

22

366 F.3d 992, 999 (9th Cir. 2004)). "While 'not impossible to meet,' that is a 'daunting standard—one that will be satisfied in relatively few cases,' especially because we must be 'particularly deferential to our state-court colleagues.'" Hernandez, 750 F.3d at 857 (quoting Taylor, 366 F.3d at 1000).

Petitioner specifically directs the Court's attention to Detective Weibert saying to Petitioner, "understand that if some foul play has befallen him, obviously one of the first places that people always point the finger is at the estranged spouse." (ECF No. 136 at 2). The Court finds it useful to view said language in the broader context of what was being said at that particular point in the interview:

LK: Larissa, let me ask you this; are you the type of person that could have anything to do with him missing?

LS: No. Not at all. No…I don't…I couldn't do…I can't. I mean, I…we've had our problems, and I dislike him and, you know, and we haven't been able to get along but I…I couldn't do that to my son. I couldn't do that. That's…

VW: And the reason that we ask is because understand that we have a lot of ...

LS: I know.

VW: …charges here…

LS: I know…I know.

VW: …I mean…we have a gamut of things that can…that could have occurred, and that's part of why we're asking you a gamut of different questions. And, we need to try and get to the bottom to find him for…

LS: Ok.

VW: …for his sake…for your son's sake, for everyone here that's involved's sake. I mean if something bad has happened to him, then we need to get that done, so that your son can get some closure that way. If he's gone away on his own, we need to find him, so that he can come back. You know, we need, or…or at least we need to get it closed because the worst thing that can happen for your son is for this to be left hanging.

LS: I know.

VW: …you know the house and the divorce thing…if some foul play has befallen him, if he's taken his life, if he's hurt himself and someone else is hurt him, we need to at least get that answer for your son so your son doesn't sit there wondering why, because what's gonna happen with your son if there's question left? He's gonna think…there's always gonna be this question in the back of his mind that be was abandoned, and why was

he abandoned. Not that some other force took his father away, whoever or whatever that was, and even if it was his father's own hand…

LS:    Yeah.

VW:    …that it was…well maybe dad's still out there somewhere and he doesn't want to see me. Why? What's wrong with me?

LS:    I understand.

VW:    And that's going to be baggage he's gonna carry around for a long time. So that's why we really need to get to the bottom of it, and…

LS:    Well, I agree with you. I don't…I mean even for me. I mean I'm not the important one here, but…

LK:    Yeah. You don't have to like somebody to care about them.

LS:    Well, I know that. I know that, and you know. I mean, there were those times…times when I just wanted to punch him, you know, but physically, I just couldn't…I mean, he's a bigger man than me. I mean…I couldn't…I couldn't…he'd probably take me down in a minute.

VW:    And I…and I understand…and understand the feelings, because I had a goofy spouse and we had a relationship that went awry, and so I understand where you're coming from.

LS:    Yeah.

VW:    So…so can understand (inaudible).

LS:    I don't think anybody that goes through a divorce at some point doesn't have some sort of…

VW:    Say, boy I wish they were dead.

LS:    Can you believe that? I actually…I actually said that to couple of my employees once, and it was like, you know, now I'm saying oh my God, you know if that's the case, I mean…I mean, it's not that…you'd want them dead, it's that you…it's just kind of a reaction and ahm, so…any…I know what you…

VW:    …let me…and I have to ask this, ok, because as we said, we have to look at all potential avenues here.

LS:    I understand.

VW:    And understand that if some foul play has befallen him, obviously one of the first places that people always point the finger is at the estranged spouse or something like that.

LS:    Exactly.

VW:    That doesn't mean that anything necessarily has happened, or that we necessarily believe that, but it's…

LS:     Right.

VW:     …but it's potential that we have to address and talking with you has
        helped to clear up a lot of things. But there's one thing that I just
        can't…can't clarify, and I need to try and get something from you…if
        you're not being entirely honest with us about a conversation or something
        like that, then you need to come forward with that now and let us know
        and hear me out. You're telling me that you rolled over and possibly
        accidentally telephoned him in the middle of the night on the night that he
        disappeared. If there was some conversation that you guys had…

LS:     No.

VW:     Let me finish please, let me finish please. If there was some conversation
        that you guys had, and he said something to you ah…and it…or…or if,
        you know, you heard something occur in the background you heard
        something and you're concerned about it, you need to let us know what
        that was.

(16 CT 4727–29).

Standing alone, the statement "understand that if some foul play has befallen him,
obviously one of the first places that people always point the finger is at the estranged spouse"
suggests that the detective was accusing Petitioner of being a prime suspect. However, a review
of the statement in the context of the broader discussion shows that the detectives repeatedly
indicated to Petitioner "a gamut of things . . . could have occurred," including running away, foul
play, suicide, self-injury, or infliction of injury by someone else. (16 CT 4727). The statement at
issue was made to explain why the detectives were asking Petitioner questions about her missing
estranged husband—because they "have to look at all potential avenues." (16 CT 4728). But, the
detectives stressed, "[t]hat doesn't mean that anything necessarily has happened, or that we
necessarily believe that . . ." (16 CT 4729).

There is no indication that the process employed by the California Court of Appeal was
defective. As set forth above, there is sufficient evidence to support the California Court of
Appeal's finding that "[n]one of the detectives' comments conveyed to Schuster that she was a
suspect in a crime, although it was one scenario they had to consider." Schuster, 2011 WL
680211, at *14. Having reviewed both the transcript and video recording of Petitioner's
interview, the Court finds that the state court's factual determinations were not unreasonable
under § 2254(d)(2).

The state court's determination that under these facts Petitioner was not "in custody" for purposes of <u>Miranda</u> was not objectively unreasonable. The <u>Miranda</u> "custody test is general," and the "more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Alvarado</u>, 541 U.S. at 665, 664. "[T]he state court delineated and weighed factors comparable to those the Supreme Court has considered," <u>Stanley</u>, 598 F.3d at 619, and the determination was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on her first claim, and it should be denied.

## B. Instructional Errors

In her second, fifth, and sixth claims for relief, Petitioner asserts that the trial court made various instructional errors. (ECF No. 4 at 26, 33, 36). Respondent argues that the state court reasonably denied relief on Petitioner's jury-instruction-based claims. (ECF No. 130 at 28).

1. <u>Legal Standard</u>

"[T]he fact that an instruction was allegedly incorrect under state law is not a basis for [federal] habeas relief." <u>Estelle v. McGuire</u>, 502 U.S. 62, 71–72 (1991). A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." <u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004). The pertinent question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." <u>Cupp</u>, 414 U.S. at 147. "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." <u>Estelle</u>, 502 U.S. at 72 (quoting <u>Cupp</u>, 414 U.S. at 147). This standard also applies to omitted instructions, <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 971 (9th Cir. 2001), but the petitioner's "burden is especially heavy because no erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a

misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

2. Accessory After the Fact

In her second claim for relief, Petitioner asserts that the trial court erred in refusing to give a requested instruction that Petitioner's acts would make her guilty of being an accessory after the fact. (ECF No. 4 at 26). Respondent argues that the state court reasonably denied relief on Petitioner's jury-instruction-based claims. (ECF No. 130 at 28, 41–42).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying Petitioner's accessory after the fact instruction claim, the California Court of Appeal stated:

> Schuster contends the trial court erred by refusing to give a requested pinpoint instruction defining the uncharged crime of accessory. We conclude the instruction properly was refused.
>
> ***The Trial Court Proceedings***
>
> As previously described, Schuster denied killing Timothy, directing Fagone to kill him, or having a hand in his death by, for instance, purchasing acid or the blue barrel for the purpose of disposing of his remains. The gist of her testimony was that she knew nothing about Timothy's death until told about it by Fagone, whereupon, rather than reporting the matter to police and running the risk of ruining T.'s trip, she helped Fagone move the barrel containing the body from her lab to her storage unit. She also made Fagone promise that he would take care of moving it somewhere it could not be found.
>
> Schuster subsequently requested that the trial court give a modified version of CALCRIM No. 440 (accessories) as a pinpoint instruction. Schuster's proposed instruction read:
>
> > "Larissa Schuster has admitted to being an accessory after the fact. She was not charged with being an accessory after the fact. To prove that the defendant was guilty of this crime, the People would have had to prove that:
> >
> > "1. Another person, whom I will call the perpetrator, committed a felony;
> >
> > "2. The defendant knew that the perpetrator had committed a felony or that the perpetrator had been charged with or convicted of a felony;

"3. After the felony had been committed, the defendant either harbored, concealed, or aided the perpetrator;

"AND

"4. When the defendant acted, she intended that the perpetrator avoid or escape arrest, trial, conviction, or punishment.

"The prosecution has requested that you determine whether Larissa Schuster was an aider and abettor. The prosecution must show that an aider and abettor intended to facilitate or encourage the target offense before or during its commission. If the defendant formed an intent to aid after the crime was completed, then he or she may be liable as an accessory after the fact. Factors relevant to determining whether a person is an aider and abettor include: presence at the scene of the crime, companionship, and conduct before or after the offense."

The trial court denied the request, finding that accessory after the fact is not a lesser included offense of the crime charged, and that courts are no longer required or allowed to instruct on lesser related offenses.[21] The trial court proposed, however, to modify CALCRIM No. 401 to make it clear that in order to be guilty based on an aiding and abetting theory, a defendant must have harbored the requisite intent before or during, but not after, the commission of the crime.[22]

Defense counsel stated that he was satisfied with the modification, but still requested that a pinpoint instruction on accessory be given. Defense counsel argued that even though accessory was not a lesser included offense, it was "very much so a lesser-related offense that conforms significantly to the factual scenario in this case," and he requested that the instruction "be given simply so as to give the jury an understanding of that particular offense as it relates to the testimony of Ms. Schuster." The trial court denied the request.

### Analysis

"Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." (§ 32.)

The crime of being an accessory is not a lesser included offense of murder. (*People v. Jennings* (2010) 50 Cal.4th 616, 668.) Whether accessory is a lesser *related* offense of murder depends, at least to a certain extent, on the circumstances of each case. (See *People v. Jones* (1993) 14 Cal.App.4th 1252, 1257–1258.) We need not decide whether it was a lesser related offense here, since, as Schuster acknowledges, "[a] defendant has no right to instructions on

---

[21] The trial court also refused to give the unmodified version of CALCRIM No. 440, which would have set out the elements of the crime of being an accessory to a felony in the same language as those elements were stated in Schuster's proposed instruction.

[22] The trial court subsequently instructed the jury: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that one, the perpetrator committed the crime, two, the defendant knew that the perpetrator intended to commit the crime; three, before or during, but not after, the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime; and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime."

lesser related offenses, even if he or she requests the instruction and it would have been supported by substantial evidence, because California law does not permit a court to instruct concerning an uncharged lesser related crime unless agreed to by both parties. [Citations.]" (*People v. Jennings, supra,* at p. 668; accord, *People v. Yeoman* (2003) 31 Cal.4th 93, 129; *People v. Birks* (1998) 19 Cal.4th 108, 112–113, 136–137 (*Birks*).)

Schuster claims the trial court erred when it relied on *Birks* to deny the request for an instruction defining the crime of accessory because she did not ask for instructions that would permit the jury to convict her of violating section 32. Rather, she says, she desired the instruction so that jurors would understand she had admitted, in her testimony, having committed a crime the prosecutor elected to withhold from jury consideration.

In light of defense counsel's references to lesser included and lesser related offenses, we are not convinced the trial court misinterpreted the basis for Schuster's request.[23] If the trial court made the correct ruling, however, we will uphold that ruling, regardless of the trial court's reasoning. (*People v. Smithey* (1999) 20 Cal.4th 936, 972.)

"Under appropriate circumstances, 'a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation].' [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99.) The trial court is required to instruct on the *law* applicable to the facts of the case; it should refuse any instruction that invites the jury to draw inferences favorable to one party from specified items of evidence. (*People v. Mincey* (1992) 2 Cal.4th 408, 437.)

We question whether it is proper for a trial court to tell a jury, as stated in the first sentence of Schuster's proposed instruction, that a defendant has admitted committing a criminal offense, even if that offense was not charged. Such a determination is more factual than legal and may involve credibility issues that should be resolved by the trier of fact, not the trial court. We also question whether the bringing or omission of particular charges is a proper subject for a trial court's instructions, as it implicates prosecutorial charging discretion that is generally not supervised by the courts. (*People v. Ceja* (2010) 49 Cal.4th 1, 7; see *County of Santa Clara v. Superior Court* (2010) 50 Cal.4th 35, 61.) The last part of the proposed instruction, which related the timing of the formation of intent to liability as an aider and abettor versus an accessory, was rendered duplicative by the trial court's modification of CALCRIM No. 401. We thus conclude the trial court did not err by refusing to give Schuster's version. (See *People v. Cash* (2002) 28 Cal.4th 703, 736.)

Schuster also contends the jury should have been informed that her act of helping Fagone hide the body amounted to a crime. She claims this was important to her legal theory that she was guilty of being an accessory, but not guilty of murder; a pinpoint instruction defining the crime proscribed by section 32 would have

---

[23] When arguing for a new trial, Schuster's attorney described the defense theory as being that the evidence showed Schuster was guilty of violating section 32, and he complained that the jury was not given the option of convicting appellant of being an accessory.

helped jurors understand that the consciousness of guilt evidence resulted from Schuster's violation of section 32, but did not indicate she was guilty of murder.

Defense counsel never articulated this theory of the defense when arguing that the trial court should give the requested instruction. Regardless, "[i]t has never been the law that an accused is entitled to instructions on offenses for which [s]he is not charged in order to urge the jury that [s]he could have been convicted of something other than what is alleged." (*People v. Valentine* (2006) 143 Cal.App.4th 1383, 1387.) Here, Schuster clearly was not precluded from arguing that her conduct was criminal and that it explained the consciousness of guilt evidence, but did not give rise to liability for the charged offense.[21] (See *People v. Rundle* (2008) 43 Cal.4th 76, 148, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) What mattered from her standpoint was not what the admitted conduct might be called or the precise elements of the crime of being an accessory, but rather that her conduct, occurring after the charged offenses, explained her guilty actions and statements but did not constitute aiding and abetting murder or make her liable for the charged offense. Thus, such an instruction was not necessary for the jury's understanding of the applicable law or Schuster's theory of the case, and it easily could have been confusing where the jury properly was not given the option of returning a verdict on the offense.[24]

Schuster, 2011 WL 680211, at *22–25 (footnotes in original).

In the petition, Petitioner clarifies that her request for the accessory after the fact instruction was not because it was a lesser related offense, but because it was Petitioner's legal theory of defense—that Petitioner was not guilty of murder but was guilty of being an accessory after the fact (a crime the prosecutor elected to withhold from jury consideration), which would explain evidence suggesting Petitioner displayed consciousness of guilt. (ECF No. 4 at 26–28).

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). Although the Supreme Court has stated that "[a]s a *general proposition* a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor," Mathews v. United States, 485 U.S. 58, 63 (1988) (emphasis added), the Supreme Court subsequently noted that "the cases in which we have invoked this principle dealt with the exclusion of evidence or the testimony of

---

[24] For the same reasons, we would conclude there was no prejudice were we to find error. (See *People v. Wharton* (1991) 53 Cal.3d 522, 571 & fn. 10.)

defense witnesses," <u>Gilmore v. Taylor</u>, 508 U.S. 333, 343–44 (1993) (citations omitted). <u>Gilmore</u> rejected the contention that the cases stood for the proposition "that the right to present a defense includes the right to have the jury consider it, and that confusing instructions on state law which prevent a jury from considering an affirmative defense therefore violate due process." <u>Id.</u> at 344.

Here, the failure to instruct on being an accessory did not prevent Petitioner from presenting her complete defense. Defense counsel argued that Petitioner's conduct was criminal, which explained evidence indicating consciousness of guilt, and constituted being an accessory after the fact, but did not satisfy the elements of the offenses the prosecution elected to bring against Petitioner. (66 RT 19521–23, 19532–33, 19558–59, 19562–63). The jury was presented with evidence of Petitioner's defense theory and was properly instructed regarding the first-degree murder charge the prosecutor elected to bring against Petitioner. As noted by the California Court of Appeal, an accessory instruction "was not necessary for the jury's understanding of the applicable law or Schuster's theory of the case, and it easily could have been confusing where the jury properly was not given the option of returning a verdict on" being an accessory. <u>Schuster</u>, 2011 WL 680211, at *25.

Based on the foregoing, the Court finds that the state court's rejection of this instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for her second claim, and it should be denied.

### 3.  <u>Financial Gain Special Circumstance</u>

In her fifth claim for relief, Petitioner asserts that the trial court erred in its instructions regarding the financial gain special circumstance. (ECF No. 4 at 33). Respondent argues that the state court reasonably denied relief on Petitioner's jury-instruction-based claims. (ECF No. 130 at 28, 44–45).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily

denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying Petitioner's financial gain special circumstance instruction claim, the California Court of Appeal stated:

> Schuster raises two claims in connection with the instructions on the financial gain special circumstance. First, she contends the trial court committed error in answering a question from the deliberating jury about the definition of that special circumstance. Second, she argues the trial court violated her federal constitutional rights by refusing her requested unanimity instruction. We reject both claims.
>
> ### The Trial Court Proceedings
>
> Pursuant to CALCRIM No. 720, the jury was instructed: "The defendant is charged with the special circumstance of murder for financial gain. To prove that this special circumstance is true, the People must prove that one, the defendant intended to kill; and two, the killing was carried out for financial gain." Jurors also were told that the People had the burden of proving the special circumstance beyond a reasonable doubt, and that in order to return a finding that the special circumstance was or was not true, all 12 jurors had to agree.
>
> During deliberations, the jury sent out a note stating it could not decide the special circumstance and needed clarification, specifically, "Does it have to be the primary reason or partial reason?" After input from counsel, and relying on *People v. Michaels* (2002) 28 Cal.4th 486 (*Michaels*), the trial court proposed to reread CALCRIM No. 720 and then add language telling jurors it was not necessary that financial gain have been the only purpose, or even the primary purpose, for the killing.
>
> The prosecutor had no objection to the trial court's proposed response. Defense counsel, however, objected to the phrase " 'or even the primary purpose for the killing.' " When asked if he had any authority that the objected-to phrase was not a correct statement of the law, defense counsel admitted he did not, but argued that all the jury needed to know was that there could be more than one purpose.
>
> The trial court noted that it was required to answer the questions of the jury to the extent possible, and that the jury specifically used the phrase " 'primary reason.' " Defense counsel responded that the challenged phrase tended to suggest that any type of purpose, no matter how weak, would support the special circumstance. He argued that "it should be a real purpose, not just a possible or light-one that doesn't have much substance to it. In other words, when you talk about primary or not primary, you suggest a weighing process.... [¶] In other words, ... if it's not a primary purpose but it's a lesser purpose, it suggests that ... any circumstance would be enough. And I don't think that's what the law requires. I think it has to be a purpose that can be found beyond a reasonable doubt."
>
> Defense counsel then requested that jurors be instructed that they had to be unanimous as to the facts or circumstances supporting the financial-gain special circumstance. He noted that they had to determine if financial gain was a motive in this case, and a lot of evidence had been presented that may or may not have

shown such a motive. The trial court denied the request, finding it similar to the defense's earlier request—also denied—that the jury be instructed to agree unanimously whether Schuster was an aider and abettor or the actual perpetrator. The trial court found no requirement in the law of juror unanimity in this situation.

When the jury returned to the courtroom, the trial court stated that it was going to read a few sentences from an instruction already given, and then add a paragraph the trial court and counsel thought addressed the specific question asked. The trial court then stated: "So the instruction was [CALCRIM No.] 720. It says, the defendant is charged with a special circumstance of murder for financial gain. To prove that this special circumstance is true, the People must prove that one, the defendant intended to kill; and two, the killing was carried out for financial gain. And here's the addition: In order to find this special circumstance true, you must unanimously find that the People have proven beyond a reasonable doubt that the intentional killing was carried out for the purpose of obtaining financial gain. However, it's not necessary that financial gain have been the only purpose for the killing or even the primary purpose for the killing."

### Analysis

Pursuant to section 190.2, subdivision (a)(1), a defendant convicted of first degree murder is subject to the death penalty or life in prison without the possibility of parole if "[t]he murder was intentional and carried out for financial gain." In *Michaels, supra,* 28 Cal.4th at page 519, the California Supreme Court held that the financial gain special circumstance applies even if the gain was only a secondary purpose.

*Michaels* in turn relied on *People v. Noguera* (1992) 4 Cal.4th 599, 635, in which the state high court rejected a claim that the failure of the standard instruction to require the jury to find that the financial gain motive was a dominant, substantial, or significant motive for the murder violated the Eighth Amendment to the United States Constitution. The trial court there reiterated that " '[p]roof of actual pecuniary benefit to the defendant from the victim's death is neither necessary nor sufficient to establish the financial-gain special circumstance,' " and instead found " ' "the relevant inquiry [to be] whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain." ' [Citation.]" (*Noguera, supra,* at p. 636, quoting *People v. Edelbacher* (1989) 47 Cal.3d 983, 1025 (*Edelbacher*).[25]

Schuster says the phrase "or even the primary purpose for the killing" required a lesser showing than that set out in *Edelbacher* because it incorrectly indicated that any purpose, no matter how weak, would support the special circumstance. We disagree. The California Supreme Court has made it clear that in order for the financial-gain special circumstance to apply, "such gain need not be the sole *or main* motive for the murder. [Citations.]" (*People v. Carasi, supra,* 44 Cal.4th at pp. 1308–1309, italics added.) Indeed, in *People v. Crew* (2003) 31 Cal.4th 822, 851, the court stated: "It is not required that the murder be committed exclusively *or even primarily* for financial gain. [Citations.]" (Italics added.) The mandate of the special circumstance provision is simply "that anyone who intentionally commits murder for purposes of financial gain should be eligible for the death penalty or life imprisonment without possibility of parole ." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1229.)

---

[25] *Edelbacher* was disapproved on another ground in *People v. Loyd* (2002) 27 Cal.4th 997, 1007, footnote 12.

The state Supreme Court has rejected the view that the financial-gain special circumstance would apply where there is any possibility of a pecuniary effect upon the defendant. (*People v. Crew, supra,* 31 Cal.4th at p. 852.) We conclude, however, there is no reasonable likelihood the jury misunderstood and misapplied the trial court's answer to the question as permitting a true finding under such circumstances. (See *People v. Smithey, supra,* 20 Cal .4th at p. 963.) The jury's request for clarification made it clear jurors were considering a reason that was at least substantial enough to qualify as a "partial" reason for the murder; they did not ask whether the mere possibility of a financial effect was sufficient, or whether it was enough if financial gain provided a slight reason for the killing.

Schuster suggests that if the trial court had simply omitted the challenged clause from the instruction, it would have been correct. The trial court's response then would have been correct as far as it went, but it would not have answered the jury's question—it would not have told them whether financial gain had to be the *primary* reason for the killing. Under section 1138, "[t]he court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)[26] While "comments diverging from the standard are often risky," "a court must do more than figuratively throw up its hands and tell the jury it cannot help." (*Ibid.*) The trial court here did not err by responding to the question as it did.

Nor did the trial court err by refusing to give a unanimity instruction. It is apparent that Schuster sought to require unanimity with respect to the motive or theory underlying the finding of financial gain—whether the anticipated gain involved the business, the house, or something else. "A requirement of jury unanimity typically applies to *acts* that could have been charged as *separate offenses.* [Citations.]" (*People v. Beardslee, supra,* 53 Cal.3d at p. 92, italics added.) " 'A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict [her] of the crime charged.' [Citations.]" (*Id.* at p. 93.) Stated another way, "When an accusatory pleading charges the defendant with a single criminal *act,* and the evidence presented at trial tends to show more than one such *unlawful act,* either the prosecution must elect the specific *act* relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific *criminal act.* [Citation.]" (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534, italics added.)

We are cited to no authority, and are aware of none, extending the concept of unanimity to a defendant's motive for committing a crime or the theory underlying the offense. As cogently explained in *People v. Russo* (2001) 25 Cal.4th 1124, 1134–1135 (*Russo*), "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not

---
[26] Section 1138 provides, in pertinent part: "After the jury have retired for deliberation, ... if they desire to be informed on any point of law arising in the case, ... the information required must be given."

agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction."

The motive or theory underlying a crime, or, in this case, the financial-gain special circumstance, is similar to the second situation described in *Russo.* Jurors were instructed that they had to agree unanimously on whether Schuster committed the murder for financial gain; the murder carried out for financial gain was the single discrete criminal event. Jurors did not have to be unanimous with respect to the exact theory supporting the conclusion that the purpose was financial gain. (See, e.g., *People v. Sapp* (2003) 31 Cal.4th 240, 283–285 [no unanimity instruction required where jurors could have relied on two different theories in finding that defendant killed victim for financial gain; incidents were intertwined and no juror would have believed one but disbelieved the other]; *People v. Millwee* (1998) 18 Cal.4th 96, 160–161 [unanimity as to theory under which killing deemed culpable—premeditation or felony murder—is not compelled as matter of state or federal law; trial court did not err by not telling jurors to agree on reason for first degree murder verdict]; *People v. Memro, supra,* 11 Cal.4th at pp. 869–870 [no unanimity required as to particular manner in which felony murder occurred]; *People v.. Mickle* (1991) 54 Cal.3d 140, 178 [where jury agreed that lewd act supporting special circumstance occurred under one of two viable, closely connected theories, failure to unanimously select one factual scenario immaterial; unanimity rule does not extend to minute details of how single, agreed-upon act was committed]; see also *People v. Nakahara* (2003) 30 Cal.4th 705, 712–713 [nothing in *Apprendi v. New Jersey* (2000) 530 U.S. 466 requires unanimous jury verdict as to particular theory justifying finding of first degree murder].)

Schuster, 2011 WL 680211, at *29–32 (footnotes in original).

### a. Trial Court's Response to Jury Question

Petitioner asserts that the trial court erred in answering the jury's question by adding language to CALCRIM No. 720 indicating that it was not necessary for financial gain to be "even the primary purpose for the killing." (ECF No. 4 at 33).

The pertinent question in federal habeas is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). In reviewing an ambiguous instruction, the Court "inquire[s] 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). In making this determination, "the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147).

The challenged instruction was given to the jury as follows:

> So the instruction was [CALCRIM No.] 720. It says, the defendant is charged with a special circumstance of murder for financial gain. To prove that this special circumstance is true, the People must prove that one, the defendant intended to kill; and two, the killing was carried out for financial gain. And here's the addition: In order to find this special circumstance true, you must unanimously find that the People have proven beyond a reasonable doubt that the intentional killing was carried out for the purpose of obtaining financial gain. However, it's not necessary that financial gain have been the only purpose for the killing or even the primary purpose for the killing.

(67 RT 19849–50). This instruction was given after the jury sent out a note stating it could not decide the special circumstance and needed clarification, specifically, "Does it have to be the primary reason *or partial reason*." (17 CT 5048) (emphasis added). In light of the jury's specific question, it was not objectively unreasonable for the state court to conclude there was no reasonable likelihood the jury misapplied the challenged instruction in a way that allowed them to find the special circumstance true based on any possibility, no matter how weak, of financial gain.

The state court properly considered the modified financial gain special circumstance instruction "in the context of the instructions as a whole and the trial record," Estelle, 502 U.S. at 72, and the Court finds that the state court's rejection of this instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

### b. Trial Court's Refusal of Unanimity Instruction

With respect to the financial gain special circumstance, Petitioner also asserts that the trial court erred in refusing Petitioner's request to instruct the jurors that they must unanimously agree on the act that satisfied the financial gain special circumstance. (ECF No. 4 at 35). That is, Petitioner apparently argues the jurors should have unanimously agreed on "the motive or theory underlying the finding of financial gain—whether the anticipated gain involved the business, the house, or something else." Schuster, 2011 WL 680211, at *31.

"Submitting a multi-theory crime to the jury without requiring unanimity on any one predicate theory is not a constitutional violation." Evanchyk v. Stewart, 340 F.3d 933, 937 n.1 (9th Cir. 2003) (citing Schad v. Arizona, 501 U.S. 624, 644–45 (1991) (plurality opinion)). See Schad, 501 U.S. at 631–32 ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission . . . . In these cases, as in litigation generally, different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." (internal quotation marks and citation omitted)); Schad, 501 U.S. at 649–50 (Scalia, J., concurring) ("As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict." (citations omitted)).

Here, the trial court issued a general unanimity instruction, (67 RT 19828; 17 CT 5034), and the jury was not required to unanimously agree on the preliminary factual issues which underlie the verdict. Therefore, the Court finds that the state court's rejection of the specific unanimity instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

4. Reasonable Doubt Instruction

In her sixth claim for relief, Petitioner asserts that the instruction given to the jury in her trial misstated the reasonable doubt standard of proof required for a criminal conviction. (ECF No. 4 at 9, 36–38). Respondent argues that the state court reasonably denied relief on Petitioner's jury-instruction-based claims. (ECF No. 130 at 28, 45).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily

denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying Petitioner's reasonable doubt instruction claim, the California Court of Appeal stated:

> The trial court instructed the jury with CALCRIM No. 220, as follows:
>
> > "The fact that a criminal charge has been filed against the defendant is not evidence that its charge is true. You must not be biased against the defendant just because she's been arrested or charged with a crime or brought to trial.
> >
> > "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove the defendant guilty beyond a reasonable doubt. Whenever I tell you that the People must prove something, I mean they must prove it beyond a reasonable doubt. Proof beyond a reasonable doubt is proof that leaves you with an *abiding conviction* that the charge is true.
> >
> > "The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt you must *impartially compare and consider all the evidence that was received through the entire trial.* Unless the evidence proves the defendant is guilty beyond a reasonable doubt she's entitled to an acquittal. And you must find her not guilty." (Italics added.)
>
> Schuster contends the emphasized language directing jurors to "compare and consider" the evidence undermined the presumption of innocence and lightened the prosecution's burden of proof by suggesting Schuster was required to produce evidence to be compared. She argues the emphasized reference to an "abiding conviction" further lightened the prosecution's burden of proof by conveying the idea of a determination that will last, but omitting the requisite concept of a conviction based on weighty evidence.[27]
>
> Both the United States and California Supreme Courts have rejected challenges to the constitutionality of CALJIC No. 2.90, which is worded similarly to CALCRIM No. 220[28] (See, e.g., *Victor v. Nebraska* (1994) 511 U.S. 1, 16–17; *People v. Farley* (2009) 46 Cal.4th 1053, 1122; *People v. Whisenhunt, supra,* 44 Cal.4th at p. 221.) We and numerous other courts specifically have rejected the

---

[27] The People suggest Schuster has forfeited any challenge to the instruction because she requested it. We disagree, because the issues raised implicate Schuster's substantial rights. (§ 1259; see *People v. Taylor* (2010) 48 Cal.4th 574, 630, fn. 13; *People v. Holmes* (2007) 153 Cal.App.4th 539, 544; but see *People v. Stone* (2008) 160 Cal.App.4th 323, 331.)

[28] CALJIC No. 2.90 defines reasonable doubt, in pertinent part, as "that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." Prior to 1994, the concluding phrase read, "an abiding conviction to a moral certainty of the truth of the charge." (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 221, fn. 13.)

argument that CALCRIM No. 220 suggests the defendant is required to produce evidence, or the closely related claim that the instruction eliminates the doctrine of reasonable doubt due to lack of evidence. (See, e.g., *People v. Zavala* (2008) 168 Cal.App.4th 772, 780–781; *People v. Garelick* (2008) 161 Cal.App.4th 1107, 1117–1119; *People v. Stone, supra,* 160 Cal.App.4th at pp. 331–332; *People v. Flores* (2007) 153 Cal.App.4th 1088, 1093; *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1156–1157; cf. *People v. Taylor, supra,* 48 Cal.4th at p. 631 & fn. 15 [rejecting claim CALJIC No. 2.90 failed to make clear defense had no obligation to present or refute evidence].)

In *Victor v. Nebraska, supra,* 511 U.S. at pages 14–15, the United States Supreme Court stated: "An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, *correctly states the government's burden of proof.* [Citations.]" (Italics added.) Courts universally have rejected challenges to CALCRIM No. 220's use of the phrase "abiding conviction," including that it conflates the separate concepts of duration and weight. (*People v. Stone, supra,* 160 Cal.App.4th at pp. 332–334; see also *People v. Zepeda* (2008) 167 Cal.App.4th 25, 28–32; *People v. Guerrero* (2007) 155 Cal.App.4th 1264; 1268; cf. *People v. Freeman* (1994) 8 Cal.4th 450, 504 & fn. 9 [suggesting modification of CALJIC No. 2.90 to refer to "abiding conviction" without references to "moral evidence" and "moral certainty"; *People v. Light* (1996) 44 Cal.App.4th 879, 884–889 [upholding postmodification version of CALJIC No. 2.90].)

We agree with the cases cited above and conclude there was no constitutional infirmity in CALCRIM No. 220 as given at Schuster's trial.[29]

Schuster, 2011 WL 680211, at *32–33 (footnotes in original).

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). The Supreme Court has stated with respect to jury instructions and the reasonable doubt standard:

> [T]he Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury."

Victor v. Nebraska, 511 U.S. 1, 5 (1994) (citations omitted) (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). "The constitutional question . . . therefore, is whether there is a

---

[29] Schuster cites us to *Stoltie v. California* (C.D. Cal. 2007) 501 F.Supp.2d 1252, the majority of which was adopted by the Ninth Circuit Court of Appeals in *Stoltie v. Tilton* (9th Cir. 2008) 538 F.3d 1296. Although the district court believed that CALCRIM No. 220 was deficient for failing to convey to jurors that they must be subjectively certain of a defendant's guilt in order to convict (*Stoltie v. California, supra,* at p. 1261), the opinion does not assist Schuster because the issue addressed was not the validity of the instruction itself, but whether an analogy made by the trial judge in an attempt to explain reasonable doubt was prejudicially misleading when taken in the context of the overall charge (*id.* at pp. 1254–1255, 1262, 1264).

1  reasonable likelihood that the jury understood the instructions to allow conviction based on proof

2  insufficient to meet the <u>Winship</u> standard." <u>Victor</u>, 511 U.S. at 6.

3       Petitioner argues that the phrase "impartially compare" implied Petitioner was required to

4  produce evidence to be compared to that of the prosecution. Petitioner contends that this error

5  was exacerbated by the "abiding conviction that the charge is true" language. (ECF No. 4 at 37–

6  38). The Court finds that the phrase "impartially compare" does not denote comparison of

7  evidence presented by the prosecution against evidence presented by the defense. Rather, the

8  instruction directed impartial comparison of all the evidence presented at trial, including

9  comparison of evidence adduced solely during the case-in-chief, whether that be measuring

10 witness testimony against the physical or documentary evidence or evaluating the conflicting

11 testimony of multiple witnesses. Further, as noted by the California Court of Appeal, the

12 Supreme Court in <u>Victor</u> stated that "[a]n instruction cast in terms of an abiding conviction as to

13 guilt, without reference to moral certainty, correctly states the government's burden of proof."

14 511 U.S. at 14–15 (citing <u>Hopt v. Utah</u>, 120 U.S. 430, 439 (1887)).

15      Petitioner has failed to demonstrate a reasonable likelihood that the jury understood the

16 trial court's instructions to allow conviction based on proof insufficient to satisfy the <u>Winship</u>

17 standard. Both the prosecutor and defense counsel repeatedly stated during closing argument that

18 the prosecution bore the burden of proving Petitioner committed the offense beyond a reasonable

19 doubt. (65 RT 19212, 19292, 19299–301, 19312; 66 RT 19502, 19559). Further, defense counsel

20 specifically emphasized that Petitioner does not have any obligation to produce evidence to be

21 compared to the prosecution's evidence, stating: "Remember it's their burden. The defense has

22 no burden. You'll never hear that a defendant in a criminal action has to prove anything." (66 RT

23 19501). "Whatever we present, the prosecution does not lessen their burden to prove every

24 element of their case beyond a reasonable doubt." (66 RT 19520).

25      Based on the foregoing, the California Court of Appeal's denial of the reasonable doubt

26 instructional error claim was not contrary to, or an unreasonable application of, clearly

27 established federal law, nor was it based on an unreasonable determination of fact. The decision

28 was not "so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on her sixth claim, and it should be denied.

## C. Ineffective Assistance of Counsel

In her third claim for relief, Petitioner asserts ineffective assistance of trial counsel for presenting evidence that Petitioner suffered from battered spouse syndrome ("BSS") but then failing to request an instruction that the jury could use that evidence to find Petitioner acted under provocation. (ECF No. 4 at 28). Respondent argues that the state court reasonably denied relief on this claim. (ECF No. 130 at 28, 42–44).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Wilson</u>, 138 S. Ct at 1192.

In denying Petitioner's ineffective assistance of counsel claim, the California Court of Appeal stated:

> Schuster contends her trial attorney provided constitutionally deficient representation when he presented evidence that Schuster suffered from BSS, but then failed to request an instruction telling jurors how they could use that evidence to find Schuster acted under provocation if they found her responsible for killing Timothy. We conclude the record fails to establish that defense counsel lacked a reasonable tactical purpose for the omission or that Schuster was prejudiced thereby.
>
> ### *The Trial Court Proceedings*
> Dr. Estner testified that BSS has to do with physical abuse, but can have emotional factors as well. It involves a spouse who will not make it possible to have a comfortable relationship, but also will not allow the relationship to end, or, from the other perspective, someone who is trapped in a bad relationship, but also is prevented from escaping it.
>
> In Estner's opinion, Schuster manifested this type of syndrome in the context of this case. Even when Estner saw her in the fall of 2003, Schuster was so obsessed with the relationship that it was as if Timothy were still alive. She continuously provided Estner with information concerning things that seemed like petty flaws of Timothy, but which had caused her great emotional distress. Estner believed Schuster's mental state when he saw her then was somewhat representative of her mental state previously.
>
> In Estner's opinion, Schuster was driven and assertive and expected that from others, including Timothy. Her expectations were not being met, as Timothy had

more of a nurturing and passive personality—in her view, passive aggressive. Schuster physically and emotionally lost capacity for the marital relationship; she was starting to become medically and mentally ill with depression, cardiac arrhythmia, and broad hair loss. Her exhibiting hatred toward Timothy made sense from a psychiatric point of view; someone who is assertive and aggressive and has those expectations of others is particularly upset by someone he or she perceives as passive. If someone is angry at another person and that person does not give an outlet for the anger, the first person just gets madder and madder.

Estner viewed Schuster's statements that she wished Timothy were dead as a type of "passive homicidality." Passive homicidality is no indication of an intent to kill the other person. Schuster's passive wishes that Timothy was dead were a way of escaping a very bad relationship, and so were consistent with the application of emotional BSS to Schuster's case.

During the jury instruction conference, the trial court confirmed that Schuster was requesting an instruction on voluntary manslaughter based on heat of passion, and that the prosecutor did not object in light of the evidence presented through Estner and others. The trial court further confirmed that the defense was withdrawing its requests for CALCRIM Nos. 850 and 851, since Estner's testimony was not intended to explain why a witness did not come forward or to offer some kind of a defense to Schuster's having murdered her husband, at least in the context of her being the perpetrator.[30]

During his argument to the jury, the prosecutor remarked that he initially was unsure of the point of Estner's testimony, since this was not a case in which a mental defense, such as not guilty by reason of insanity, was being offered. He now thought that the point of the testimony was to explain why Schuster was so angry. Defense counsel did not mention Estner's testimony in his closing argument. He did tell jurors, however: "But homicide, voluntary manslaughter, second-degree murder, first-degree murder, she's not guilty of any of them. And please don't compromise and say well, you know, she didn't like her husband. And she said these mean things."

Pursuant to CALCRIM No. 570, the trial court subsequently instructed:

---

[30] As requested, CALCRIM No. 850 read: "You have heard testimony from an expert, Miles Estner, of battered women's syndrome _____ <insert other description used by expert for syndrome>). [¶] Dr. Estner's testimony about (battered women's syndrome/intimate partner battering/_____ <insert other description used by expert for syndrome>) is not evidence that the defendant committed any of the crimes charged against (him/her). [¶] You may consider this evidence only in deciding whether or not 's_____ <insert name of alleged victim of abuse> conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of (his/her) testimony."

CALCRIM No. 851 read: "You have heard testimony from Dr. Miles Estner regarding the effect of battered women's syndrome/intimate partner battering/_____ <insert other description used by expert for syndrome>). [¶] Dr. Estner's testimony about (battered women's syndrome/intimate partner battering/_____ <insert other description used by expert for syndrome>) is not evidence that the defendant committed the crime charged against her. [¶] You may consider this evidence only in deciding whether the defendant actually believed that (he/she) needed to defend (himself/herself) against an immediate threat of great bodily injury or death, and whether that belief was reasonable or unreasonable. [¶] When deciding whether the defendant's belief was reasonable or unreasonable, consider all the circumstances as they were known by or appeared to the defendant. Also consider what conduct would appear to be necessary to a reasonable person in a similar situation with similar knowledge."

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of a sudden quarrel or in the heat of passion if one, the defendant was provoked; two, as a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured her reasoning or judgment; and three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is from passion rather than from judgment.

"Heat of passion does not require anger, rage or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. In order for heat of passion to reduce a murder to voluntary manslaughter the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. It's not enough that the defendant simply was provoked. The defendant is not allowed to set up her own standard of conduct. You must decide whether the defendant was provoked and whether the provocation ... was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.

"If enough time passed between the provocation and the killing for a person of average disposition to cool off and regain her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, then you must find the defendant not guilty of murder."

As previously described, jurors convicted Schuster of first degree murder.

### *Analysis*

Schuster contends that, because nothing in CALCRIM No. 570 suggested that evidence of BSS could be used to find provocation, defense counsel was remiss in not requesting a modified version of CALCRIM No. 851 in order to inform the jury of that legal principle.[31]

We have not found any authority allowing evidence of BSS to be admitted on the issue of provocation (as opposed to self-defense), or discussing how such evidence relates to voluntary manslaughter based on sudden quarrel or heat of

[31] Schuster suggests: "You have heard testimony from Dr. Stephen Estner regarding the effect of battered spouse syndrome. [¶] Dr. Estner's testimony about battered spouse syndrome is not evidence that the defendant committed the crime charged against her. [¶] You may consider this evidence only in deciding whether the defendant acted with provocation if you find that she is legally responsible for the death of Timothy Schuster. [¶] I have defined provocation for you in another instruction. If you find the defendant killed Timothy Schuster while acting under the influence of legal provocation, you should find her not guilty of murder but rather guilty of voluntary manslaughter."

passion. We will assume it is admissible for that purpose, however. (See Evid.Code, § 1107; *People v. Coffman and Marlow, supra,* 34 Cal.4th at pp. 98–101.) Although we express no opinion concerning the propriety of the language of the instruction Schuster now proposes, we also will assume that a modified version of CALCRIM No. 851 would be given upon proper request. (But see *People v. Steele* (2002) 27 Cal.4th 1230, 1252–1253 [for voluntary manslaughter, both provocation and heat of passion must be affirmatively shown; because circumstances giving rise to heat of passion are viewed objectively, defendant's "'extraordinary character and environmental deficiencies,'" including "psychological dysfunction due to traumatic experiences," are irrelevant to the inquiry].)

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687–694.)

"If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal,* competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.)

Here, the record fails affirmatively to disclose the lack of a rational tactical purpose for the challenged omission. (See *People v. Ray* (1996) 13 Cal.4th 313, 349.) The clear theory of the defense was that Schuster was not guilty of anything but being an accessory. That defense counsel wanted the jury given the option of finding voluntary manslaughter based on heat of passion does not mean he reasonably could not place his emphasis, both in terms of what to argue and what instructions to request, on obtaining a complete acquittal. Under the circumstances, defense counsel reasonably could have decided that CALCRIM No. 570 was adequate, and that more extensive instructions on the subject would simply detract from the defense's push for a not guilty verdict without adding much to the jury's understanding of the applicable legal principles.

Furthermore, the record affirmatively establishes that omission of an instruction on BSS did not prejudice Schuster. The California Supreme Court has stated that " '[h]eat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59 (lead opn. of Baxter, J.).) By contrast, that court has defined " 'deliberate' " as " ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for

and against the proposed course of action" ' " and " 'premeditated' " as " ' "considered beforehand." ' " (*People v. Memro* (1995) 11 Cal.4th 786, 862–863.) "First degree willful, deliberate, and premeditated murder 'involves a cold, calculated judgment,' " even if arrived at quickly (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306); thus, the state of mind for that offense " 'is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct.' [Citation.]" (*Ibid.*)

Under the instructions given here, jurors could return their verdict of first degree murder only if they found Schuster acted "willfully, deliberately and with premeditation." They were told, in pertinent part, that Schuster acted "willfully if she intended to kill"; "deliberately if she carefully weighed the considerations for and against her choice, and knowing the consequences, decided to kill"; and "with premeditation if she decided to kill before committing the act that caused the death." They expressly were told that "[a] decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated."

The jury was given a comprehensive instruction on provocation and heat of passion, and nothing in that instruction precluded a consideration of BSS with respect to the issue. (See *People v. Wharton, supra,* 53 Cal.3d at p. 572.) In light of jurors' rejection of the notion that Schuster's reason was obscured or disturbed by passion, the giving of a pinpoint instruction relating BSS to provocation clearly would not have made any difference in the verdict. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 586; *People v. Wharton, supra,* at p. 572.) This is especially true where, as here, the evidence of premeditation and deliberation was overwhelming.[32]

Schuster, 2011 WL 680211, at *25–29 (footnotes in original).

1. *Strickland* Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel"

---

[32] In *People v. Berry* (1976) 18 Cal.3d 509, the California Supreme Court found that the trial court's error in refusing to instruct on voluntary manslaughter based on sudden quarrel or heat of passion was prejudicial, despite the defendant's having been convicted of first degree murder. (*Id.* at pp. 512, 518.) In that case, however, the instructions referred only casually to heat of passion and provocation, and then only for the purpose of distinguishing between first and second degree murder. (*Id.* at p. 518.) Under the circumstances, the reviewing court was unable to conclude that the verdict of first degree murder indicated the jury necessarily resolved the factual question posed by the omitted instruction adversely to the defendant under other, properly given instructions. (*Ibid.*) Here, by contrast, an instruction on heat-of-passion voluntary manslaughter was given that directed the jury to consider evidence of Timothy's course of allegedly provocative conduct, and placed on the People the burden of disproving heat of passion beyond a reasonable doubt. Contrary to the situation in *Berry,* the jury's finding of first degree murder here necessarily meant jurors resolved the factual issue adversely to Schuster and found her state of mind to be inconsistent with that necessary for voluntary manslaughter. Accordingly, *Berry* does not control our prejudice analysis.

guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover, because Strickland articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in

order to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (quoting Burt v. Titlow, 571 U.S. 12, 15 (2013)). When this "doubly deferential" judicial review applies, the inquiry is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

2. Analysis

In the instant case, the defense's theory clearly was that Petitioner was only guilty of being an accessory after the fact. Defense counsel's closing argument centered around complete acquittal and Petitioner's contention that she did not participate in the killing and only learned about the death after it occurred. (65 RT 19298, 19301, 19312, 19314–15; 66 RT 19504–09, 19521–24, 19561–63). In pertinent part, defense counsel argued:

> But there are lesser charges. There is first-degree murder. There is second-degree murder. And there is voluntary manslaughter that's charged. There is no room for compromise. I for a minute am not suggesting that you compromise or that Larissa Schuster's guilty of anything other than the one charge that they didn't charge her with. And they make that decision. I don't. We don't. Accessory after the fact to murder, which she is guilty of. And she's admitted it. But they just didn't want or choose to charge her.

(66 RT 19562–63).

"Where counsel pursues one theory of the defense over another, counsel's lack of request for a jury instruction on the alternate theory does not constitute deficient performance." Pensinger v. Chappell, 787 F.3d 1014, 1031 (9th Cir. 2015). Strickland instructs that courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," 466 U.S. at 689, and the California Court of Appeal's determination that "defense counsel reasonably could have decided that CALCRIM No. 570 was adequate, and that more extensive instructions on the subject would simply detract from the defense's push for a not guilty verdict without adding much to the jury's understanding of the applicable legal principles," Schuster, 2011 WL 680211, at *28, was not objectively unreasonable.

Further, the California Court of Appeal reasonably concluded that Petitioner did not demonstrate "there is a reasonable probability that . . . the result of the proceeding would have been different," Strickland, 466 U.S. at 694, if trial counsel had requested a BSS instruction

47

given that the jury: (1) was instructed on heat of passion and provocation; (2) was not instructed to disregard or was otherwise precluded from taking the BSS testimony into consideration; and (3) was instructed that in order to return a verdict of first-degree murder, they must find Petitioner acted "willfully, deliberately and with premeditation" and that a "decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated." (67 RT 19819, 19820; 17 CT 5029).

Based on the foregoing, under AEDPA's "doubly deferential" review, Donald, 135 S. Ct. at 1376, the Court finds that the state court's rejection of Petitioner's ineffective assistance claim for failure to request a BSS instruction was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for ineffective assistance of counsel, and the claim should be denied.

### D. Juror Discharge

In her fourth claim for relief, Petitioner asserts that the trial court erred in discharging Juror No. 001 during trial without conducting an adequate hearing to determine whether that juror was able to perform her duties. (ECF No. 4 at 9, 30–33). Respondent argues that the state court reasonably denied relief on Petitioner's juror discharge claim. (ECF No. 130 at 45).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying the juror discharge claim, the California Court of Appeal stated:

> Schuster contends the trial court committed reversible error and violated her federal constitutional rights when it discharged Juror No. 001 near the end of trial. The People say Schuster has failed to show an abuse of discretion in light of the juror's commission of serious misconduct. We conclude Juror No. 001 was discharged properly.

48

### *The Trial Court Proceedings*

The jury was sworn on October 18, 2007.[33] When telling jurors where they should gather the following Monday, the bailiff expressly asked them to be on time.

The evidentiary portion of trial began on October 22. In the course of its preinstructions, the trial court told jurors, inter alia, that they could discuss the case together only after the evidence had been presented, the attorneys had completed their arguments, and the trial court had instructed on the law. The trial court also admonished the jurors to keep an open mind throughout the trial and not to make up their minds about any issue in the case until after they discussed the case with the other jurors during deliberations. Last, the trial court told them that they would be permitted to separate at recesses, and that at the end of the day the trial court would tell them when to return and that it was important that they be there on time. The trial court again cautioned jurors not to talk about the case or any people or subjects involved in it with anyone, including each other, during the breaks, and not to make up their minds about any issue prior to deliberations. The trial court told jurors that they would be advised to " 'remember the admonition' " every time they left the courtroom, and that this would remind them not to talk about the case and not to form or express any opinion about it until it was finally submitted to them.

At the outset of the morning session on October 24, the trial court stated that one juror was late for the second time in a row, and it had instructed the bailiff to tell her that "we're not doing this any longer. Running late is not an excuse to be late to court." The trial court confirmed with both counsel that they did not think anything else should be done.

At the outset of the morning session on November 5, the trial court observed that one of the jurors had been consistently late, including that morning, despite the 10:00 a.m. start. That the juror in issue was Juror No. 001 was made clear when she apologized after the jury was brought into the courtroom.

At the outset of the afternoon session on November 7, the trial court noted for the record that Juror No. 001 was 20 minutes late. At the parties' request, however, the trial court did not do anything about it for the time being.

On November 8, the prosecutor interrupted testimony concerning the location of the cell phone towers that handled various calls and asked for a bench conference, at which he voiced concern about Juror No. 001. The trial court excused the jury for the morning break, had Juror No. 001 brought in, told her that people were concerned she might have been upset or crying in the courtroom, and asked if she was all right. She responded, "I'm fine. I'd like to go have a smoke. I'd like to go have a cigarette. And I'd just like to carry on and listen to the testimony and do what needs to be done." The trial court again asked if she was okay; she responded, "I'm fine. Thank you very much. And I apologize if for some reason I've in any way disrupted or otherwise this proceeding. I don't—I just need a cigar. Okay? How is that?"

After the juror was excused to take her break, the trial court noted that it had discussed with both counsel, in chambers, Juror No. 001's behavior, apart from concerns about her being late on several occasions and the disappointment other

---

[33] Further references to dates in this section of the Discussion are to dates in 2007.

49

jurors had expressed about her tardiness. The trial court observed that Juror No. 001 had been in court all morning wearing sunglasses for no apparent reason, and had had her head down and seemingly had been inattentive to the testimony and exhibits. It also noted that one of the other jurors had told the bailiff that most of the jurors were distracted by Juror No. 001's behavior during trial, and that the day before the juror sitting next to Juror No. 001 appeared to be distracted by Juror No. 001's standing up, sitting down, moving around, and going through her purse during testimony. The trial court determined that neither party was asking it to undertake any further inquiry at that point.

On the morning of November 27, Juror No. 001 was approximately 25 minutes late. On the afternoon of November 29, the trial court asked jurors if they could continue a little past 4:30 p.m. Juror No. 119 related that she had to teach a class at 5:00 p.m., and so, given traffic conditions, she was already late. Juror No. 001 interrupted and said, "Hell, late is late. I know that. I'm sorry."

When the trial court took the morning break on December 4, it asked Juror No. 001 to remain behind. The trial court informed her of its observation that she had had trouble maintaining a still position in the jury box over the course of the trial. The trial court further noted that the previous day she came into the courtroom with some food and her purse, and that she went in and out of her purse during the proceedings. This was reported to the trial court as being distracting to the other jurors. Juror No. 001 apologized and said she would "try real hard" not to feel in her bag. The trial court informed her that it had to stop. The juror offered to leave her purse in the jury room, and she again apologized.

After she left the courtroom, the trial court informed counsel that at least one juror had told the bailiff that she and others were distracted by Juror No. 001's behavior. The trial court did not propose to take any additional action unless either attorney wanted it to consider something further. Neither did.

At the end of the day, the trial court informed the parties that the bailiff had related that two other jurors were now reporting continued distracting behavior by Juror No. 001 and were offering to address the trial court on that issue. The prosecutor related that he thought he had heard some audible expression— possibly a chuckle—from Juror No. 001 during Schuster's testimony. The prosecutor noted that he had been upset earlier with a different juror giving Schuster a "thumbs up" sign, which the prosecutor considered an expression of opinion, and the prosecutor believed this was almost the equivalent. He felt it was improper conduct and noted that it occurred after the entire jury was admonished regarding that type of behavior. The prosecutor expressed concern about Juror No. 001 remaining and opined that some inquiry was required, at least of the two jurors who now were reporting problems. The trial court then ascertained that one of the jurors, Juror No. 119, had already left, but that Juror No. 121 was still there, as was Juror No. 69, who had complained that morning.

The trial court then solicited defense counsel's views. Defense counsel stated that the jury was made up of 12 different people, and that a juror did not have to fit a certain mold. He stated that for the most part, he had observed Juror No. 001 to be attentive and now making an effort to be on time. Defense counsel stated he was against micromanaging the affairs of the jury by talking with one juror about the conduct of another. He felt it was a dangerous practice and did not think the trial court ought to allow the jurors to be divisive in the sense that they were telling on one another. He opined that they should just leave it alone.

The trial court agreed with defense counsel that there should be severe limits on the extent to which a court examined jurors about the conduct of other jurors in the course of a trial. At the same time, the trial court felt it had some obligation, in light of the concerns expressed by some of the jurors, to ensure that they had been attentive and to let them know that the trial court had undertaken to address the problem with Juror No. 001. Neither counsel voiced an objection. Juror Nos. 69 and 121 then were brought in, and both confirmed that they had been able to give their attention to the evidence, despite the distractions. The trial court informed them that it had admonished Juror No. 001 that the distracting behavior was to stop.

After the jurors left, the prosecutor requested that the trial court replace Juror No. 001 based on the cumulative effect of the various incidents that had occurred. Defense counsel stated that he did not think there should be any further action or inquiry. The trial court invited the prosecutor to provide some authority that Juror No. 001's behavior rose to the level of serious misconduct that would authorize the trial court to excuse her.

At the beginning of the December 6 session, the trial court confirmed that neither party was asking it to remove Juror No. 001 at that time. The prosecutor then began his opening summation. Advised that Juror No. 119 wanted to address the trial court, the trial court asked her to remain at the lunch recess. When asked what had happened, Juror No. 119 replied: "It's not what you say, it's what you do. And there are five or six of us wondering why Juror 001 is still here after so many complaints that * * * *121 ... and I made yesterday as well. You folks are not in the jury room and we are. So we know of a hell of a lot more what's going on than what is expressed within here. I'm sorry for my language. But several of us are angry and feel that this hampers the jury."

Asked to specify the conduct she had observed, Juror No. 119 related that Juror No. 001 had no respect for the entire proceeding and had been talking about what was going on in the courtroom. Juror No. 119 said that she personally knew of it happening two days earlier, and that it was not specifically what Juror No. 001 said as much as "innuendo and attitude," such as, "Well, we're sure as hell not going to believe that, ha, ha." Juror No. 119 also was upset by Juror No. 001 laughing, in light of what was presented the preceding Monday. She explained: "Monday we were presented with the pictures of the deceased. And I take that tremendously seriously and many of us do. And, um, her attitude all along has been oh, she's not a bad person. But she's lackadaisical and not serious about this entire procedure. And I know that when you present this to her she will promise to be [a] good girl and everything. But what you say is not what you do."

The prosecutor noted that the jury had been admonished, both at the beginning of trial and later, not to form or express any opinions, and he asked when Juror No. 001 made the statement about who was going to believe something. Juror No. 119 responded: "It was previous to Tuesday[, December 4]. Because when it came to a head on Tuesday it was because she had drunk two cans of Red Bull at lunch and was sitting back there scribble, scribble, scribble. She'd shift the page, scribble, scribble, scribble. The court reporter has several times looked back. I've seen the judge look back. [¶] I cannot tell you that it is specifically something that she has said, but her manner of behavior is extremely distracting. And I can't speak for others but oh, boy, she's a distraction. And I personally—I don't trust her to be fair. And I have been told several times that she was going to be replaced. And several of us are wondering why she hasn't been? And so, you know, you have to think okay, if that's what we've been told, it must be

something that she has said to change that opinion. Because many of us have complained over the course of the past two months...." Juror No. 119 then related that Juror No. 001's comment, which was something to the effect of who was going to believe that, was probably made within the preceding two weeks.

Defense counsel confirmed with Juror No. 119 that it was not Juror No. 001's words, but rather her attitude and manner of behavior that was the problem. Juror No. 119 stated: "People's eyes are going or rolling or something like that. Okay? Um, so I can't tell you that it's specific. We have been together for two months now. And it's become sort of like a little family. And we do not discuss the proceedings that go on in here. Period. End of statement. Because everyone takes this tremendously seriously. This is incredibly serious. And we all know it. And we are all weighed with that burden. And to have somebody acting like that really pisses me off."

After Juror No. 119 exited the courtroom, the trial court noted that several weeks earlier—possibly not even halfway into the trial—Juror No. 118 had reported to the bailiff that when he and Juror No. 001 went out on cigarette breaks together, Juror No. 001 attempted to engage him in conversation about the case. Juror No. 118 specifically told her, possibly on more than one occasion, that they could not talk about the case. When that was related to the bailiff, the trial court shared it informally with counsel, neither of whom believed any record needed to be made, or any inquiry of Juror No. 118 undertaken, at that point. Instead, it was agreed that at the end of that court session the trial court would specifically remind the jurors that they were not to talk about the case or form or express any opinions about it with each other or anyone else, rather than simply telling them to remember the admonition.

The trial court expressed the view that Juror No. 001's apparent refusal to comply with the trial court's specific directions not to talk about the case or express any opinion constituted serious and willful misconduct, such that it was the trial court's tentative intention to replace her as a juror. The trial court viewed the report of Juror 119—which it saw as coming "from her heart" and which it was inclined to accept—as demonstrating a direct violation of the trial court's ongoing orders, and it invited both counsel to think about their responses over the lunch recess and also whether there was a need for further investigation.

After the lunch break, the prosecutor renewed his request that Juror No. 001 be replaced with an alternate juror without further investigation or inquiry. Defense counsel viewed the proposed action as being "particularly drastic," given the stage of the proceedings. When he observed that Juror No. 001 was never specifically admonished after the purported incident with Juror No. 118, the trial court responded that it was because defense counsel did not want her specifically admonished. Defense counsel found it obvious Juror No. 001 was not part of the family Juror No. 119 said the jury had become, but that was not misconduct.

Defense counsel further expressed concern with Juror No. 119's saying they were told Juror No. 001 was going to be removed. He wanted to know who told them that and suggested they had committed the real misconduct by talking among themselves about wanting her removed. Defense counsel moved for a mistrial or, if not granted, objected strongly "to empowering this one group of people, or the so-called members of the family, by dismissing Juror 001...." He further asserted that what Juror No. 001 said about who would believe something was not much different than what anybody serving on a jury over a lengthy period of time might say.

The trial court found good cause, within the meaning of section 1089, to discharge Juror No. 001, and it denied the motion for mistrial. The trial court disagreed with the defense characterization of Juror No. 119's remarks about the jurors becoming a family as somehow meaning Juror No. 001 was excluded from that family. More importantly, it found this had been an ongoing issue with Juror No. 001 since the beginning of trial. It further noted that it had started by dealing with Juror No. 001's lateness informally and had advised the bailiff to let her know that if it continued, she could be excused from the jury. The trial court concluded that this was the source of Juror No. 119's reference, as the other jurors became aware, probably through Juror No. 001 herself, that she had been warned about the consequences of late and rude behavior. Then it was agreed that all of the jurors would be reminded of the importance of the trial court's admonition not to talk about the case or form or express any opinion. The jurors were so reminded.

The trial court concluded that the incident concerning Juror No. 001 reported by Juror No. 119 constituted a direct and continuing violation of the trial court's admonition not to talk about the case or form or express any opinions. The trial court disagreed with the opinion that a comment about the credibility of a witness was the kind of comment jurors typically make. The trial court believed it constituted good cause for discharge, particularly in light of everything else. The trial court found that this was not just a single instance of improper behavior, "but an ongoing apparent disregard of the court's directions and instructions to ensure both sides here a fair trial."

As to whether further investigation was required or desirable, the trial court found it had to weigh the need to demonstrate further the accuracy of Juror No. 119's report and what the trial court already had heard about Juror No. 001's behavior against the danger of inquiring into the other jurors' points of view and the risk of invading their thought processes about this case. Accordingly, the trial court declined to undertake any further inquiry of the other jurors as it was satisfied, from everything it had heard, that there was sufficient evidence that Juror No. 001 could not and would not comply with the trial court's reasonable directions. The trial court then related that the preceding Tuesday the news cameraman had told counsel that Juror No. 001 had asked whether the prosecutor was married. Whatever the meaning, the trial court found it particularly inappropriate and a further demonstration that Juror No. 001 was unable to perform her duties and to follow the trial court's instructions, as well as some suggestion of prejudice on her part.

The trial court then had Juror No. 001 brought into the courtroom. It informed her that she was being excused as a juror in this case, whereupon she asked for help with a traffic ticket she had received that morning. After she left, the other jurors were brought in and admonished not to let anything that had happened affect their judgment, and not to consider any statements Juror No. 001 may have made. The trial court asked if anyone thought he or she could not set aside what had occurred; no one responded. An alternate juror was substituted in place of Juror No. 001, and the prosecutor then completed his opening summation.

Schuster subsequently moved for a new trial on the grounds, inter alia, that the trial court erred by dismissing Juror No. 001 and failing to inquire properly into the veracity of Juror No. 119's claims. In denying the motion, the trial court reiterated the history of the problems with Juror No. 001. It noted that had Juror No. 119's allegations occurred without more, the trial court might have asked

Juror No. 001, and possibly others, about the circumstances reported by Juror No. 119. Instead, Juror No. 119's claims added to a clear series of failures by Juror No. 001 to comply with the trial court's directions. In the trial court's view, the entire course of conduct demonstrated serious misconduct, which was why the trial court discharged her and declined to undertake further investigation concerning the accuracy of what Juror No. 119 had reported.

### Analysis

"Section 1089 authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.' A trial court 'has broad discretion to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve.' [Citation.]" (*People v. Bennett* (2009) 45 Cal.4th 577, 621; see *People v. Boyette* (2002) 29 Cal.4th 381, 462, fn. 19.)

While broad, however, the trial court's discretion is not unlimited. (*People v. Roberts* (1992) 2 Cal.4th 271, 325.) " 'The juror's inability to perform the functions of a juror must appear in the record as a "demonstrable reality" and will not be presumed. [Citation.]' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 349.) "The demonstrable reality test 'requires a showing that the trial court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [disqualification] was established.' [Citation.] To determine whether the trial court's conclusion is 'manifestly supported by evidence on which the court actually relied,' we consider not just the evidence itself, but also the record of reasons the trial court provided. [Citation.] In doing so, we will not reweigh the evidence. [Citation.]" (*People v. Wilson* (2008) 43 Cal.4th 1, 26.) We will uphold the trial court's determination if it is supported by substantial evidence. (*People v. Bennett, supra,* 45 Cal.4th at p. 621.)

A juror's repeated willful violation of the trial court's instructions, even if neutral as between the parties, is serious misconduct from which a trial court may conclude that the juror will not follow other instructions and is therefore unable to perform his or her duty as a juror, thus warranting discharge. (*People v. Wilson* (2008) 44 Cal.4th 758, 834–835; *People v. Daniels* (1991) 52 Cal.3d 815, 863–864.) The record here establishes, as a demonstrable reality, that Juror No. 001 committed serious and deliberate misconduct by violating the trial court's instructions to refrain from discussing the case and expressing opinions thereon. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 743; *Daniels, supra,* 52 Cal.3d at pp. 864–865; compare *Wilson, supra,* 44 Cal .4th at p. 836.) Hence, substantial evidence supports the trial court's determination that she was unable to perform her duty within the meaning of section 1089. (See *People v. Williams* (2001) 25 Cal.4th 441, 448.)

Schuster argues, however, that the trial court failed to conduct an adequate hearing to determine whether Juror No. 001's conduct amounted to serious and willful misconduct justifying her discharge. Schuster faults the trial court for accepting Juror No. 119's report as true without making an effort to determine from other jurors whether that report was accurate.

When a court is informed of allegations, which, if proven true, would constitute good cause for a juror's removal, a hearing sufficient to determine the facts is required. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051; *People v. Keenan* (1988) 46 Cal.3d 478, 538; *People v. Burgener* (1986) 41 Cal.3d 505, 519,

disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 756.) The trial court must make " 'whatever inquiry is reasonably necessary to determine if the juror should be discharged.' " (*People v. Farnam* (2002) 28 Cal.4th 107, 141; accord, *People v. Bradford* (1997) 15 Cal.4th 1229, 1348.) Although the investigation may include live testimony where appropriate (*People v. Keenan, supra*, at p. 538), the scope of the investigation is "committed to the sound discretion of the trial court. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.)

Here, the trial court held a hearing, allowing Juror No. 119 to speak and then both counsel to question her regarding her allegations concerning Juror No. 001. Under the circumstances, we conclude this constituted adequate inquiry. The question of credibility was one for the trial court, which was able to assess both the behavior and demeanor of Juror No. 119 when she spoke and also the behavior and demeanor of Juror No. 001, both while evidence was being presented and previously when Juror No. 001 was questioned about her behavior. (See *People v. Wilson, supra*, 44 Cal.4th at p. 835; *People v. Lucas* (1995) 12 Cal.4th 415, 489.) "[A] juror's 'behavior and demeanor [may] suppl[y] substantial evidence ...' of good cause for discharge. [Citation.]" (*People v. Zamudio, supra*, 43 Cal.4th at p. 349.) Given the trial court's assessment of Juror No. 119's credibility, Juror No. 001's previous conduct and the complaints by other jurors, and especially the prior report by Juror No. 118 that Juror No. 001 was discussing the case, in violation of the trial court's oft-repeated admonition not to do so, the trial court was not required to question Juror No. 001 or the remaining jurors. (See *People v. Ramirez* (2006) 39 Cal.4th 398, 456–458 [trial court discharged juror after receiving information that several jurors had seen him sleeping during trial; at hearing, jury foreperson was questioned].) This is especially true in light of defense counsel's previously expressed concerns in that regard.

The trial court did not abuse its discretion by discharging Juror No. 001 or denying Schuster's motion for a new trial. Since legal grounds to discharge Juror No. 001 existed, it follows that the discharge of the juror did not deny Schuster her federal constitutional rights. (*People v. Boyette, supra*, 29 Cal.4th at p. 463, fn. 20.)

*Schuster*, 2011 WL 680211, at *15–22 (footnote in original).

The Ninth Circuit has "consistently held that 'the California substitution procedure' outlined in California Penal Code § 1089 'preserve[s] the "essential feature" of the jury required by the Sixth and Fourteenth Amendments.'" Bell v. Uribe, 748 F.3d 857, 867–68 (9th Cir. 2014) (quoting Miller v. Stagner, 757 F.2d 988, 995 (9th Cir. 1985)). In addition, the Ninth Circuit "has repeatedly recognized the lack of clearly established law governing the dismissal of jurors." Frank v. Lizarraga, 721 F. App'x 719, 719 (9th Cir. 2018).

Two pertinent Supreme Court cases with respect to hearings on juror misconduct or bias are Remmer v. United States, 347 U.S. 227 (1954), and Smith v. Phillips, 455 U.S. 209 (1982). In Remmer, a juror in a federal criminal trial was contacted by a third party who communicated

that the juror could profit by bringing in a verdict favorable to the defendant. The juror reported the incident to the trial judge, who discussed it with the prosecutors but not the defense. The Federal Bureau of Investigation was requested to investigate and based on the ensuing report, the trial judge and prosecutors concluded that the statement was made in jest. The defense learned about the incident after the jury returned its verdict and moved for a new trial. The district court denied the motion without holding a hearing. Remmer, 347 U.S. at 228–29. The Supreme Court reversed, finding that the "trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." Id. at 229–30.

Smith involved a juror in a state criminal trial who, during the trial, applied for an investigator position in the state prosecutor's office. Although the prosecuting attorneys knew of the juror's application, they chose not to inform the court or the defense until after the jury returned the verdict. Smith, 455 U.S. at 212–13. After holding a hearing in which the juror and prosecutors testified, the trial court denied the defendant's motion to vacate his conviction, finding that the juror was not biased and that the evidence did not suggest a "sinister or dishonest motive" on the part of the prosecutors. Id. at 213–14. The Supreme Court reversed the lower federal court's grant of habeas relief, finding that the trial court's hearing was sufficient to comply with due process. Id. at 217–18.

The Ninth Circuit has "interpreted Smith and Remmer as providing a flexible rule." Tracey v. Palmateer, 341 F.3d 1037, 1044 (9th Cir. 2003). "Remmer's command that hearings are warranted in *every* case is unique to the tampering context," and "Smith leaves open the door as to whether a hearing is always required and what else may be 'sufficient' to alleviate any due process concerns" Id. Thus, "[a]n evidentiary hearing is not mandated *every* time there is an allegation of jury misconduct or bias." Id. (alteration in original) (quoting United States v. Angulo, 4 F.3d 843, 847 (9th Cir. 1993)). Rather, Remmer requires a hearing when there is presumptively prejudicial improper contact between a juror and an outside party yet the state does not prove harmlessness and the prejudicial effect of the communications is unclear from the

existing record. <u>Godoy v. Spearman</u>, 861 F.3d 956, 962, 966 (9th Cir. 2017) (en banc).

In <u>Tracey</u>, the Ninth Circuit held that a state court's refusal to question a juror further about the names of two other jurors who spoke negatively about the defendant and to take additional testimony from those two jurors was not contrary to, or an unreasonable application of, Supreme Court precedent. 341 F.3d at 1044. The Ninth Circuit noted that although an evidentiary hearing was not required, the state court did in fact hold a hearing on the record with the parties present, and its decision not to hold a more in-depth hearing "was the kind of discretionary inquiry best left to the sound judgment of the trial judge." <u>Id.</u> at 1045.

Similarly, here, the trial court held a hearing on the record with the parties present. (65 RT 19244–71). In light of Juror No. 001's history of misbehavior and demonstrated inability to follow the trial court's prior instructions and admonitions, the trial court's decision declining to further investigate "was the kind of discretionary inquiry best left to the sound judgment of the trial judge." <u>Tracey</u>, 341 F.3d at 1045. <u>Remmer</u> and <u>Smith</u> do not mandate an evidentiary hearing whenever there is an allegation of jury misconduct or bias, and "<u>Smith</u> leaves open the door as to . . . what else may be 'sufficient' to alleviate any due process concerns." <u>Tracey</u>, 341 F.3d at 1044.

Based on the foregoing, the California Court of Appeal's denial of Petitioner's erroneous juror discharge claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on her fourth claim, and it should be denied.

### E.  Cumulative Error

In her seventh claim for relief, Petitioner asserts that cumulative effects of errors committed at trial rendered her trial fundamentally unfair. (ECF No. 4 at 10, 38). Respondent argues that the state court reasonably denied relief on Petitioner's cumulative error claim. (ECF No. 130 at 53).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying the cumulative error claim, the California Court of Appeal stated:

> Last, Schuster contends that the cumulative effect of errors committed at trial rendered the proceedings fundamentally unfair, thereby violating her right to due process. Since we conclude there were no errors, it follows that there was no cumulative prejudice. Schuster received a fair trial.

Schuster, 2011 WL 680211, at *33.

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. . . . even where no single error rises to the level of a constitutional violation or would independently warrant reversal." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers v. Mississippi, 410 U.S. 284, 298, 302–03, 290 n.3 (1973)). The Ninth Circuit has "granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) (citing Parle, 505 F.3d at 933).

As discussed above, the Court has found that the state court reasonably rejected Petitioner's claims of error, and thus, there were no errors to cumulate. The state court's denial of the cumulative error claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on her seventh claim, and it should be denied.

///

# V.

## RECOMMENDATION

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 20, 2019**   

UNITED STATES MAGISTRATE JUDGE